## Hudson *et al. v.* Putney *et al.*

Decided December 21, 1878.

1. Prior to the Code of 1850 a court of equity in a suit for partition of land could decide on the rights of parties to participate in the division, but not on the simple question of title to the land; and if the plaintiff's title was denied, and it depended on doubtful facts, or questions of law, the court should have either dismissed the bill, or retained the cause till the plaintiff's rights were decided at law.

2. But since the passage of the Code of 1850 (see ch. 124 ¿1, p. 526, ch. 79, ¿1, p. 487 Code of W. Va.) when the title of the plaintiff is doubtful, the court of equity should decide the question, observing the general rules of practice in courts of equity for the purpose of ascertaining facts either by a jury, or otherwise as may be most proper.

3. The claim of the defendants in their answer, that they hold possession of the land sought to be partitioned adversely, will not oust the jurisdiction of the court, where they hold no adverse title, and their possession appears to be in point of fact not adverse to the plaintiffs but under the same title.

4. An adverse possession depends upon the intention, with which the possession was taken and held. Wherever the act itself imports that there is a superior title in another, by whose permission and in subordination to whose still continuing and subsisting title the entry is made, such entry can not be adverse to the owner of the legal title ; and such possession so commencing can not be converted into adverse possession, but by disclaimer, the assertion of adverse title and notice.

5. A vendee, who enters under an executory contract which leaves the legal title where it was and contemplates a future

71

conveyance, enters in subordination to it, holds under and relies upon it to protect his possession in the meantime. And in such case a privity exists, which precludes the idea of a hostile tortious possession, which could silently ripen into a title by adverse possession under the statute of limitations.

Appeal from and *supersedeas* to a decree of the circuit court of Kanawha county, rendered on the 12th day of October, 1874, in a cause in said court then pending, in which John Hudson and others were plaintiffs, and James Putney and others were defendants, allowed on the petition of said plaintiffs.

Hon. Joseph Smith, judge of the seventh judicial circuit, rendered the decree complained of.

GREEN, PRESIDENT, furnishes the following statement of the case:

In July, 1868, John Hudson, Joseph Hudson, Enoch Hudson and Matthew Hudson, the appellants, brought a suit in chancery in the circuit court of Kanawha county against James Putney, the heirs of David Ruffner, who were Lewis Putney, Richard E. Putney, said James Putney, Ann Doyle, Fannie Doyle, Ellis Thayer, Ernest Thayer, Annie Thayer, Henry Norton, Lewis Ruffner, David L. Ruffner, Wm. H. Ruffner and Arthur Howell and Ann, his wife, Eliza Patton administratrix *de bonis non* of John Alderson, and his heirs, who were Z. A. Woodson and Sarah his wife, Thomas G. Alderson and Margaret his wife, Hester Alderson, the infant children of Rufus D. Alderson, to-wit, B. Ammer Alderson and Rufus D. Alderson, Matilda Alderson, the infant children J. M. Alderson, deceased, to-wit, M. Jordon Alderson, Charlie R. Alderson and Betty M. C. Alderson, B. A. Alderson, R. D. Alderson, M. J. Alderson, C. R. Alderson, B. M. C. Alderson and Hester Alderson, as guardian of the infant children of Rufus D. Alderson, deceased, and Matilda Alderson, as guardian of the infant children of J. M. Alderson, deceased.

The bill states, that on June 29th, 1868, the complain-

ants purchased of a portion of the heirs at law of J. Alderson, to-wit, all but the five last named and from the then administrator of J. Alderson, said Z. A. Woodson, for $1,000.00, of which $600.00 was paid in cash, all their right in a certain contract made by John Alderson with James Putney, whereby in consideration of $350.00, of which $100.00 was paid in cash and the balance to be paid in six and eighteen months, John Alderson on April 10, 1851, agreed to make said Putney a deed with general warranty for seventy acres of land, reserving to John Alderson one-half of the coal on said land with all the rights necessary to enjoy same; the deed to be made when all the purchase money was paid. This land so contracted to be sold being a tract of land patented to George Alderson, deceased, lying on Spring Fork of Campbell's run, in Kanawha county, W. Va., and which tract, after deducting the interlaps of older patents, contained about seventy acres; and they file with their bill this contract between J. Alderson and James Putney, the assignment of it to the complainants by the administrator and a portion of the heirs of J. Alderson, and a plat of the land patented to George Alderson. And the bill further states, that the plaintiffs understood that the heirs of David Ruffner in some way claim the interest of James Putney in this seventy acres of land, and are thus co-tenants with the complainants in the coal on said land; that they had removed a large quantity of coal from the land, for which they pray an account, and that the proper division of the coal interest in this land may be made among the co-tenants thereof, and that their vendor's lien on this land may be enforced against James Putney and those claiming under him.

The survey on which the patent to George Alderson was based, was made February 16, 1800, and it contained two hundred and fifty-six acres; but the whole of this survey was taken up before except seventy and three-fourths acres by older surveys and patents which covered the residue of this two hundred and fifty-six

acres; one was a survey of John Dickinson of five hundred and two acres made November 12, 1784, and the other was for nine hundred acres surveyed for James Reed, August 21, 1786, and patented to Reed & Brown. George Alderson having obtained this patent, which gave him a good title to this seventy and three-fourths acres of land, died shortly thereafter, in the year 1805; and by his will he gave all his lands to his wife for life, and disposed of the remainder in a number of tracts, but made no disposition of this tract on Spring Fork of Campbell's creek.

It appears from this will, that when it was written, in May, 1801, the testator had six children then living: John, Catherine, Levi, George, Joseph, and James Osborne. If he had no others, and these or their issue survived him, then the interest of John Alderson, as one of the heirs of George Alderson, in this tract of seventy and three-fourths acres was one undivided sixth part thereof, after the death of his mother. It does not appear when she died, or that she ever had possession of any part of this land. Between the years 1822 and 1849, but at what times do not clearly appear, portions of this seventy and three-fourths acres of land were in the possession of different parties, some of these claiming to be tenants of John Alderson or of Alderson & Ruffner, and some of them as tenants of D. Ruffner.

James Putney in his answer states, that the defendants, the heirs of David Ruffner, of whom he was one, are claiming this land under a title bond executed October 12, 1808, by John Alderson to John Gallahan, which title bond was assigned to Robert Johnson in November, 1809, and that in October, 1810, it was assigned by Ben. Johnson, the heir of Robert Johnson, to Joseph Caldwell, and in April, 1822, this bond was assigned by Joseph Caldwell to David Ruffner. This bond with its various endorsements is filed as an exhibit with this answer, and is as follows:

1878
Special Term.

Hudson et al.
v.
Putney et al.

"*Article of agreement entered into between John Alderson, of Monroe county, and John Gallahan, of Kanawha county*:

Whereas, this day John Alderson hath sold to John Gallahan three and one-half undivided parts of lands lying on a branch of Campbell's creek, known by the name of Spring Fork, adjoining a survey of Andrew Donnally, and purchased of Abraham Ruffner; for the performance thereof said Alderson binds himself, his heirs, executors, &c., in the penal sum of $900.00 to be paid to John Gallahan, his heirs, executors, &c. Be it further understood that Alderson is to make to said Gallahan, his heirs, &c., a good and sufficient title and *fee simple* to said lots of land, so soon as the youngest child comes of age, and give him, said Gallahan, *peaceable* and unmolested possession, on demand for—in consideration the said Gallahan paid to said Alderson a horse beast for the above said land. Said Alderson further binds himself to procure a complete relinquishment of the widow's dower to the above said land to said Gallahan.

"In witness whereof we set our hands and affix our seals this day above written.

"John Alderson, [Seal.]

"Teste: Joseph Ruffner, Samuel Burk.

"*October* 12, 1808."

The endorsements on this bond are:

"November, 1809. I have paid John Gallahan $100.00, being Robert Johnson's money, for the within bond, for the benefit of said Robert Johnson; and said Gallahan agreed that said Johnson shall have the benefit of this bond. But the said Gallahan is not to be liable for any failure on the part of said John Alderson, as said Gallahan has paid said Alderson the said horse beast for this bond or article of agreement.

"Jacob Martin, Sr.

"Teste: Jacob Martin, Jr., Joel Martin."

"I assign the within bond to Joseph Caldwell, without any responsibility on myself as to the title.

"*October* 1, 1810.          Ben. Johnson."

"I assign all my right to the within bond or agree-
ment to David Ruffner.

"JOS. CALDWELL.

"*April* 20, 1822."

This bond with its endorsements after the formation
of this State, was spread on the record books at the in-
stance of James Putney.

D. L. Ruffner, another heir of David Ruffner and a
defendant in this cause, proves that he got this title-
bond of Lewis Ruffner, who was one of the heirs and
the administrator of David Ruffner, deceased, and he de-
livered it to the heirs of Mrs. Ann Putney, who were
also heirs of David Ruffner ; and one of them was James
Putney.   He says the land described in this bond is this
George Anderson survey; and that said David Ruffner
and his heirs claimed and occupied this seventy and
three-fourths acres in controversy under this title-bond.

It is true that Ann E. Putney, Susan E. Thayer, and
R. E. Putney, heirs of David Ruffner, in their answer
deny that they ever held any of this land in controversy
under the Alderson title, but claim that it was held by
David Ruffner and the heirs under the Dickinson and
Reed and Brown surveys, which David Ruffner owned in
part, and that these surveys covered the whole of the
Alderson survey.   This was however obviously a mis-
take, as there were seventy and three-fourths acres of the
Alderson survey not covered by those other surveys, and
as the bounds of these other surveys were well known,
David Ruffner could not have held this seventy and
three-fourths acres of land under the supposition it was
covered by these older surveys.

L. Ruffner, one of the heirs of David Ruffner, in his
answer says, that his father, David Ruffner, in his life-
time and his heirs since his death have held possession
of this George Alderson survey, but he denies, that it
was held under and by virtue of the George Alderson
survey, but on the contrary it has been, he says, held and
occupied by an entirely distinct and adverse title.   And

1878
Special Term.

Hudson *et al.*
v.
Putney *et al.*

he says, that this Alderson survey was covered by those other surveys. He mentions two of them, the Dickinson and Reed & Brown surveys, which he admits do not cover the whole of the Alderson survey, but he fails to state any other survey which covered any part thereof, and as none other anywhere appears except a recent one, which will be presently stated, the possession of David Ruffner in his lifetime of the seventy and three-fourths acres could only have been under this title-bond of Alderson's; and on his death his heirs could have had possession of it only under this bond.

This being the state of the case, James Putney, one of the heirs of David Ruffner, obtained on August 25, 1849, a patent for one hundred and twenty-five acres of land, which covers this seventy and three-fourths acres of the patent of George Alderson. And on the 10th day of April, 1851, he made a written contract with John Alderson, whereby he was to give $5.00 per acre for the tract of land on Spring Fork of Campbell's creek patented to George Alderson and recited to belong to John Alderson, supposed to contain seventy acres after deducting conflicting claims, he to pay therefor $100.00 in cash, which he did pay, and the residue to be paid in three equal installments at six, twelve and eighteen months, upon the payments of which John Alderson was to make to James Putney a deed for seventy acres with general warranty, the said John Alderson receiving one-half of the coal on said land with all the rights necessary to enjoy the same. James Putney was at liberty to take possession at once. This agreement was spread, October 24, 1859, on the record book by the clerk of the county court of Kanawha county.

This purchase of this seventy and three-fourths acres was treated as though it was a purchase for all the heirs of David Ruffner. For in the partition of the lands belonging to Lewis Ruffner, Henry Ruffner and David Ruffner's heirs this seventy and three-fourths acres of land was divided with the other lands on March 10, 1858,

and this seventy and three-fourths acres was assigned to certain of the heirs of David Ruffner, that is, to Ann E. Doyle, Susan E. Thayer, R. E. Putney, James Putney, Francis Norton and Lewis Putney, children of Ann E. Putney, and perhaps to some others. And a deed conveying these lands accordingly dated March 10, 1858, was signed by all the parties by W. S. Summers, special commissioner, by order of the court in a suit which had been brought for making such partition. The heirs of David Ruffner remained in possession of portions of this seventy and three-fourths acres of land till this suit was brought by the assignees of John Alderson for a partition of the coal and for other purposes, as before stated.

To this bill, the substance of which has been stated, Ann E. Doyle, Susan E. Thayer and R. E. Putney filed their answer, in which they claim they have nothing to do with the interest of James Putney in this seventy and three-fourths acres of land, nor do they claim said interest, but they claim said land only as heirs of David Ruffner, who claimed it under the Dickinson, Brown and Reed surveys, which covered the whole of it. This was a mistake, as we have seen. They set up this partition and claim to have had for many years adversary possession of this land.

James Putney, on the contrary, in his answer claims, that the heirs of David Ruffner held the land under the title bond made by John Alderson, before stated. He states likewise in his answer, that in 1855 this land was sold for taxes returned delinquent in the name of George Alderson, and was purchased by Wm. D. Shrewsbury, who had since obtained a deed therefor, which constitute a cloud on the title. He claims, that he has paid to John Alderson $100.00, which is more than sufficient to cover any portion of said land for which he had a good title, if indeed he had title to any part of this land.

The administrator and heirs of John Alderson, except the infants, admit the statements in the bill to be true in their answers.

An order of survey was made and executed, from which it appeared that the portion of. the George Alderson survey not covered by older patents was seventy and three-fourths acres.

In a supplemental bill the plaintiffs set up, that since the suit was instituted, in a suit brought by the heirs of one Donnally against Ruffner's heirs this land had been sold, or a part thereof, and bought by E. H. Ruffner, and a deed made to him, and he conveyed the same to L. Ruffner, and he to Stephen F. Dana and Ezra R. Andrews; and that one of the complainants had procured a tax deed for this land. They ask that they may be secured in their tax title, and that E. H. Ruffner, L. Ruffner and Dana and Andrews may be made defendants. They file the various deeds referred to as exhibits.

L. Ruffner in his answer claims that this land was held by David Ruffner's heirs, not under but adversely to the George Alderson survey; but, as before stated, he fails to show under what other title they held it. The answer states, that the tax deed set up by the plaintiffs was improper, illegal and invalid. He also states, that he had conveyed on March 20, 1873, to Lewis Ruffner, Jr., and Ernest Howard Ruffner, trustees, among many other tracts the land in controversy, upon various trusts specified in the deed, which is filed as an exhibit.

The answers of Dana and Andrews deny generally, that the plaintiffs are tenants in common with those under whom they claim, and also deny the validity of the tax deed of the plaintiffs.

The plaintiffs filed another amended bill in which they state, that the procuring of the tax deed by John Hudson was for the benefit and use of all the plaintiffs.

To this amended bill the defendants, Lewis Ruffner and Andrews and Dana, file an answer, in which they say, that James Putney claimed this land not under heirs of George Alderson, but he claimed under the patent to him, before referred to, which they file as an exhibit.

James Putney filed an answer to the amended bill, in which he sets out the will of George Alderson and the title-bond of John Alderson to John Gallahan and the various assignments of it, as before stated, and files the same with its endorsements. He claims, that John Alderson had no interest in this land when he sold it to him, and asks that the contract made with him be rescinded and his purchase money refunded; and that the tax deed of the plaintiffs is a nullity, as this land was assessed to other parties, who had the title and paid the taxes in the same years in which it was returned delinquent in the name of John Alderson, and for such delinquency bought by the plaintiffs.

David L. Ruffner filed his answer in which he sets up the tax deed aforesaid to Wm. D. Shrewsbury, dated October 3, 1868; that previous to his purchase he, Shrewsbury, had acquired from Henry Ruffner, deceased, the title to this seventy and three-fourths acres of land, and that said Ruffner afterwards re-acquired said title by sale under a trust deed made by Shrewsbury, which on his death descended to his heirs, of whom David L. Ruffner was one. The various deeds referred to were filed.

The plaintiffs replied specially to this answer, and alleged that this tax deed was a nullity, as George Alderson, in whose name it was taxed, had been dead seventy years, and all the taxes chargeable against this land had been since 1850 duly paid by James Putney. They file the certificate of the clerk to prove this allegation.

The infant heirs of David Ruffner file their answers by their guardian *ad litem* asking the protection of the court; and the administrator and heirs of John Alderon file their answer admitting the facts stated in the amended bills.

To the various answers filed in the cause general replications were filed and the cause matured for hearing.

The evidence in the cause showed, that the lines of this George Alderson survey and of the Dickinson and Brown survey were readily ascertained by the surveyor, and are not disputable.

The court on the 12th day of December, 1874, rendered this final decree :

"The several demurrers of the defendants, James Putney, L. Ruffner, S. F. Dana, E. R. Andrews, and D. L. Ruffner, to the plaintiffs' original and amended bills being argued and submitted to the court, said demurrers are all overruled. And thereupon this cause came on to-day to be further heard upon the papers heretofore read and proceedings had therein ; upon the amended and supplemental bill, and the second amended bill of plaintiffs heretofore filed, and upon the answer of said Lewis Ruffner to said amended and supplemental bill heretofore filed, to which the plaintiffs reply generally ; and upon the joint answer of S. F. Dana and E. R. Andrews, to said amended and supplemental bill, to which the plaintiffs reply generally ; and upon the joint answer of L. Ruffner, E. R. Andrews and S. F. Dana, to said second amended bill, with general replication to said answer of D. L. Ruffner to the plaintiffs' original and amended bills with general replication to said answer ; and upon the answer of James Putney, to said amended bills with general replication thereto ; and upon the exhibits filed with said amended bill and the several answers aforesaid ; and upon the survey, plats and report of Sylvester Chapman made and filed in the cause ; and upon the depositions of witnesses taken and filed in the cause, and was argued by counsel ; upon consideration whereof the court is of opinion and doth decide, that the plaintiffs are not entitled to the relief prayed for.

"It is therefore adjudged, ordered and decreed, that the plaintiff's bill and amended bill be dismissed, and that the defendants recover of the plaintiffs their costs by them about their defense in this behalf expended, including $30.00 as allowed by law. The court is further of opinion and doth decide, that the contract set out in complainants' bill made and completed on or about the 10th day of April, 1851, between John Alderson and the defendant, James Putney, for the purchase by said

Putney from said John Alderson of what is known as the George Alderson survey of a hundred acres on the Spring Fork of Campbell's creek, in Kanawha county West Virginia, should be rescinded and annulled. It is therefore adjudged, ordered and decreed by the court, that said contract between said John Alderson and James Putney be and the same is hereby rescinded, cancelled, set aside and held for naught. And it further appearing to the court from the pleadings and proof in this case, that said James Putney paid to the said John Alderson on the said 10th day of April, 1851, the sum of $100.00 on the purchase money of the land in the contract above rescinded, and that said Putney is entitled to recover back the said $100.00 from the personal representative of said John Alderson with interest, it is therefore further adjudged, ordered and decreed by the court, that Z. A. Woodson, administrator *de bonis non* of John Alderson, deceased, do pay to the said James Putney out of the goods and chattels of his intestate in his hands not yet administered the sum of $242.00, being the amount of the purchase money paid by said James Putney to said John Alderson as aforesaid, including interest to date, with legal interest on said sum from the date of this decree until paid.

From which decree the plaintiffs and Z. A. Woodson, as administrator of John Alderson, obtained an appeal and *supersedeas* from this Court.

*J. S. & T. B. Swann*, for appellants, cited the following authorities:

4 W. Va. 686; 10 Gratt. 145; 2 W. Va. 353; 24 Wend. 221; 5 Leigh 192; 10 Gratt. 305; 1 Wend. 419; 14 Johns. 223; 6 Cow. 178; 4 Wend. 278; 5 Cow. 127; 3 Johns. 291; 9 Johns. 169; 10 Johns. 475; 3 Harr. & M. 581; 1 Stark. Ev. 67, 383.

*Knight and Hogeman*, for appellees, relied on the following authorities:

Code W. Va. ch. 31, §24; 7 W. Va. 149; 4 Rand. 74;

5 Leigh 195 ; 10 Gratt. 145 ; Code, ch. 79, §1 ; 24 Wend. 220 ; 7 Hill (N. Y.) 476 ; 9 Barb. 634 ; 3 Ohio St. 344 ; 1 Com. 242; 7 Wheat. 535; 16 Pet. 54 ; 2 Marsh. A. K. 27 ; 4 Lit. Sel. Cas. 274; 15 Mass. 495; 12 Mo. 238 ; 16 Mo. 273; 33 Mo. 269 ; 19 Ill. 545 ; 5 Wall. 268 ; 33 Pa. St. 270 ; 8 W. Va. 450 ; Code, ch. 125 §36.

*1878
Special Term.*

*Hudson et al.
v.
Putney et al.*

GREEN, PRESIDENT, delivered the opinion of the Court : ·

The counsel for the appellants insist, that the plaintiffs have no interest in the seventy and three-fourths acres of land, and that if they had, this suit cannot be maintained, as the defendants in their answer deny, that the plaintiffs or any one else other than themselves, have any such interest, and expressly disclaiming the existence of a tenancy in common claim to hold this land independently and adversely.

*Syllabus 1.*

Upon the principles on which a court of equity acts it cannot undertake to settle the title to lands between adverse claimants, unless the plaintiff has some equity against the party claiming adversely to him. See *Lange v. Jones,* 5 Leigh 192. And, independent of statute law, this principle applies as much in a suit for partition as in any other case. In such cases it may decide upon the rights of parties to participate in the division, but not on the simple question of the title to the lands. *Stuart's heirs* v. *Coalter,* 4 Rand. 74. If the title of the plaintiff is admitted or clear, a bill in equity for partition is a matter of right ; but if the title of the plaintiff is denied, and it depends on doubtful facts or questions of law, a court of equity would, prior to the Code of 1850, either dismiss the bill, or retain it until the right was decided at law. *Straughan et al.* v. *Wright et al.,* 4 Rand. 493. But by that Code the powers of a court of equity in such case were enlarged. See ch. 24, §1, p. 526. And this has been continued in our Code. See Code of W. Va., 79, §1, p. 486. It is thereby enacted, that in the exercise of jurisdiction, in cases of partition among tenants

*Syllabus 2.*

1878
Special Term.
Hudson et al.
v.
Putney et al.

Syllabus 3.

in common, a court may take cognizance of all questions of law which may arise in any proceedings.

Under this statute it has been decided, that if, in a suit in equity for partition, the plaintiff's title is doubtful, the court of equity should decide the question, observing the general rules of practice in courts of equity, for the purpose of ascertaining facts, either by enquiry, or otherwise, as may be most proper. *Currier et al* v. *Spraull et al.*, 10 Gratt. 145. Under this statute the right of the court in such a case as this to decide on the plaintiff's title, even had it been purely a legal title, cannot be questioned.

But it is insisted, that under this statute the court of equity has not conferred on it the power to decide the validity of the legal title of the defendants, when it is adverse to that of the plaintiffs; and that, as before the passage of this statute, such title can only be decided by a court of law. 'It is unnecessary for us to consider or decide this question, as it does not properly arise in this case. In this case the defendants set up no title, which is adverse to that of the plaintiffs. It is true, the answers of several of the defendants state, that they hold this seventy and three-fourths acres of land by a title adverse to the plaintiffs, and that they have held for more than twenty years, and still hold, possession of this land adversely to the plaintiffs. But they show no title adverse to the plaintiffs; and the possession, which they assert and prove, so far from being adverse to the plaintiffs has really been at all times in the possession of the plaintiffs themselves, or the possession of those under whom the plaintiffs claim. And it will hardly be contended, that the jurisdiction of a court of equity to make partition of land can be defeated by the mere allegation by the defendants in their answer that they hold adverse possession, when in point of fact they do not. For if this were so, a court of equity could be defeated at any time in the exercise of its jurisdiction by such false allegation in the answers of the defendants.

1878
Special Term.

Hudson *et al.*
v.
Putney *et al.*

Until 1849, when James Putney obtained a patent which covered this seventy and three-fourths acres of land, there is no pretext that the defendants, or any of them, or that their ancestor, David Ruffner, either had, or claimed to have, any title adverse to the title of George Alderson, under whom the plaintiffs claim. It is expressly stated by James Putney, one of the heirs of David Ruffner, that he and his heirs held the possession of this land claiming it under the title bond of John Alderson, an heir of George Alderson, to John Gallahan dated October 12, 1808; and it is expressly proved by David L. Ruffner, another defendant and heir of David Ruffner, that David Ruffner and his heirs had been in the possession of this land claiming it under this title-bond. There is nothing in this record to indicate, that prior to 1849 they had any pretense of claim to this land under any other title than this bond. They had other claims to the land conveyed by the Dickinson, Reed and Brown surveys; but they did not cover this seventy and three-fourths acres of land.

It is well settled, that the possession and claim of land by a vendee under an executory contract of purchase can not be adverse to the vendor; but he must be regarded as holding the land for the vendor and by his permission. See *Hamilton* v. *Taylor*, Litt. Sel. Cas. (Ky.) p. 444; *Clarke* v. *McClure*, 10 Gratt. 310; *Williams* v. *Snidow*, 4 Leigh 14.

The title-bond of John Alderson to Gallahan in this case on its face does not profess to convey the whole of this land, only an undivided part thereof. Its language is: "Three and one-half undivided parts of the land &c." David Ruffner, who took possession of this land under this bond, could only take it claiming to be a tenant in common with such of the heirs of George Alderson as had not disposed of their interest. He could under this bond have claimed but an undivided part of this land; and taking possession under it he necessarily recognized the heirs of George Alderson as tenants in com-

mon with him. After the death of David Ruffner, his heirs came into the possession of this land, claiming to hold it under this title-bond, which on its face was an agreement to sell but an undivided interest in this land; and they thus necessarily held possession of this land under one of the heirs of George Alderson, and as tenants in common with any other heirs of George Alderson who owned an interest in this land.

James Putney, one of the heirs of David Ruffner, holding the land under this Alderson title in this manner, in 1849 procured a patent from the State of Virginia for this land. But this patent thus procured, while holding or claiming to hold this land as a tenant in common with George Alderson's heirs, could not change his possession into an adversary possession. For where a defendant has entered under the plaintiff, and acknowledged his title as that under which he holds, he cannot afterwards by his own act change the character of his possession, unless he makes an open and explicit disclaimer of holding under the plaintiff's title, accompanied with the assertion of an adverse title in himself and notice to the party, under whom he entered, of such adverse claim. Whenever the act itself imports, as in this case the conduct and acts of David Ruffner did, that there is a superior title in another, in subordination to whose continuing and subsisting title the land was taken possession of, such taking of possession cannot of course be adversary to the owners of the legal title. And such possession so commencing cannot be converted into an adversary possession but by a disclaimer, the assertion of an adverse title and notice thereof to the owners of the legal title. See *Clarke* v. *McClure,* 10 Gratt. 310.

Judge Marshall in *Kirk* v. *Smith,* 9 Wheat. 241, says: "It would shock the sense of right, which must be felt equally by legislators and by judges, if a possession, which was permissive and entirely consistent with the title of another, should silently bar that title."

In the present case there was on the part of James

Putney, when he obtained this patent covering this land in 1849, no such open and explicit disclaimer of his or the heirs of David Ruffner holding under this title-bond of John Alderson; accompanied with the assertion that his patent was an adverse title, under which he would thereafter claim, with notice thereof to John Alderson, or any of the heirs of George Alderson. On the contrary shortly thereafter, on April 10, 1851, he recognizes the continued existence of the Alderson title, and enters into a contract with John Alderson for the purchase of this seventy and three-fourths acres of land of him, and agrees that he should reserve one-half of the coal on this land. This was an executory contract; and on the principles we have laid down it is clear that he and all those holding under him have continued to hold this land in subordination to the heirs of George Alderson.

It is clear from these principles, that though John Alderson by this contract undertook to sell and agreed to make to James Putney a good title to all this land, yet as he held possession of it, by the occupation of the heirs of David Ruffner, only as a tenant in common with the other heirs of George Alderson, he could not by his own act convert the possession into one adversary to his co-tenants, heirs of George Alderson; for he never did any act, which could be regarded as an actual ouster of them; and this contract of sale, without any notice to them, could not be possibly regarded as an actual ouster of them. In fact it is a contract which, if they choose to assent to it, would in law enure to the common benefit of all the heirs of George Alderson.

It is obvious from the principles I have laid down, that nothing has occurred since 1851, which can change the possession of this land by any of the defendants in this cause into an adversary possession against John Alderson's heirs, or the heirs of George Alderson, or any persons claiming under them. Neither the division of this land among David Ruffner's heirs in 1858, so much relied upon by appellees' counsel, nor any of the subse-

73

quent conveyances of this land, nor the tax deed made to Shrewsbury in 1868 for the land sold in 1855 on account of the alleged delinquency of George Alderson's heirs in the non-payment of taxes thereon, nor the acquisition of this title by Henry Ruffner or his heirs can have the effect of changing the possession of any of the defendants, or of other parties who have held this land, into a possession adverse to the heirs of John Alderson, or the heirs of George Alderson, or any person claiming under them ; for it is not pretended, that any of these acts were accompanied by an open and explicit disclaimer by the parties of their holding under the Alderson title, or of an assertion at the time these acts were done, of an adversary title in them, and of a notice thereof to John Alderson, or his heirs, or to the heirs of George Alderson. In fact no such open and explicit disclaimer is shown, except by the answers of some of the defendants in this cause. And no notice of such disclaimer even up to this time is pretended to have been given to any of the heirs of George Alderson, except to the children of John Alderson, and to them only by their being parties to this suit. And for like reasons the tax deed made to John Hudson, assignee of Hamilton Huff, in 1873, on account of the alleged delinquency of George Alderson's heirs in the payment of taxes on this land, can have no effect in changing the possession of this land into an adverse possession against the heirs of George Alderson or those claiming under them.

It is therefore unnecessary and improper to consider, or decide, whether these tax deeds are, or are not, valid, and if valid, whether they, as well as the patent to James Putney, would not enure equally to the benefit of all the heirs of George Alderson. There are authorities which give countenance to this view. Thus in Pennsylvania it is held, that a purchase by one of several tenants in common of the common property at a tax sale, or under an execution issued against all, gives rise to a resulting trust for the benefit of all, though the purchaser

was not acting as their agent, and intended to acquire the land for himself. See *Gibson* v. *Winslow,* 10 Wright 380; *Maul* v. *Rider,* 1 P. F. Smith 377; 9 *Id.* 167. But the question whether these decisions are based on sound principles, and whether they are applicable so as to affect the operation of this patent, or tax deeds; it is unnecessary to consider; and I decline to express any opinion with reference thereto. It is sufficient in this case to decide, that neither this patent, these tax deeds, the partition of the land by the deed of partition of March 10, 1858, nor any of the other deeds appearing in this record, nor any other fact which has been shown, renders the possession of this land heretofore, or now, adverse to the heirs of George Alderson, or to the heirs of John Alderson, or persons claiming under them or either of them.

If then the plaintiffs have shown that they have an undivided interest in the coal underlying this seventy and three-fourths acres of land, under the title of George Alderson, they are entitled by this suit to have a partition of the same, when they bring before the court all the other parties who have interest in this coal.

The first enquiry is then : Have the plaintiffs an undivided interest in this coal ? They claim such interest only through the contract for the sale of this land made by John Alderson with James Putney on April 10, 1851. This contract the circuit court set aside, it is presumed, because it considered that John Alderson had in 1851 no interest in this land. If he had no interest then in this land, the action of the circuit court was right, and the plaintiffs can have no interest in this coal, and their suit was properly dismissed.

Had John Alderson then any interest in this George Alderson land in 1851 ? His father George Alderson had a good title thereto ; and after the death of his wife John Alderson inherited a portion of it as one of his heirs. From the will of George Alderson it would appear he had six children who, it is presumed, survived him. If so, John Alderson inherited from his father one un-

divided sixth part of this seventy and three-fourths acres of land. Did he effectually part with his interest in this land by the title-bond, or agreement, made with Gallahan on October 12, 1808? This depends upon the question whether a court of equity would now decree a specific execution of this agreement. It is clear, that the heirs of David Ruffner, or those claiming under them, could not ask the specific execution of this agreement. For the endorsements on this bond, or agreement, and the evidence in this case do not show, that John Gallahan ever assigned it to any person, or if he did, that David Ruffner ever owned this bond, or agreement. All that the evidence does show is, that he claimed to own this bond, and under it took possession of this land. Nor could John Gallahan, or any one claiming under him ask the specific execution of this agreement. Seventy years have elapsed since it was executed; and the parties to it have been long dead. This alone would effectually prevent a court from entertaining any suit asking for its specific execution, even were it such an agreement as could otherwise have been enforced by a specific execution. But it is not such an agreement; for if we assume it refers to this land, it would be void for its uncertainty as to what portion of the land John Alderson agreed to sell. The agreement says, it was three and one-half undivided parts of the land; but it is impossible to say whether it was three and one-half one-fifth or one-tenth parts. It is therefore on its face so uncertain as effectually to prevent its specific enforcement. And if parol testimony could be received to render it certain, it is evident that no such testimony could be produced now, as seventy years have elapsed since this agreement was made. As therefore this agreement could not be ordered to be specifically executed, John Alderson must be held to have been the owner of one undivided sixth part of this seventy and three-fourths acres of land in 1851.

It is clear that he could not be held to have tbeen he

owner of more than one sixth of said land. It is not pretended to be shown that he ever purchased the interest of his brothers and his sisters in this land, or that in the division of the lands of George Alderson among his heirs it was assigned to him. There is no reason to believe that any such division ever took place. On the contrary we would infer from George Alderson's will, that this was the only tract of land which he owned, other than those he specifically devised. And this he probably did not devise, simply because, when his will was written, he forgot that he owned it, this land being then of little value.

The heirs of John Alderson therefore cannot carry out his contract to make a good title to this land to James Putney; and he had therefore a right in his answer to ask the affirmative relief of setting aside and cancelling this contract of John Alderson made April 10, 1851. This he did, on the ground that John Alderson had a good title to no part of this land. As however John Alderson's heirs have a good title to one-sixth part of this seventy and three-fourths acres of land, it may be that James Putney might desire conveyance by them of this one-sixth of this land and a reimbursement to him of so much of the purchase money, and interest thereon, paid by him, as exceeded the one-sixth part of the entire purchase money to be paid by him under his contract, and the proper modification of the contract arising from this inability on the part of Joseph Alderson's heirs to carry it out. And if James Putney should so elect, he ought still to be permitted so to do; and this cause must be remanded to the circuit court to give him an apportunity to so elect. If he does so, the heirs of John Alderson and their assigns, including the plaintiffs, to the extent to which they have acquired an interest as such assignees, will be entitled to one undivided twelfth part of the coal underlying this seventy and three-fourths acres of land at the date of said contract, instead of one-half thereof, as claimed by the plaintiffs in their bill;

and as the other heirs of George Alderson, deceased, or those claiming under them, are entitled to five-sixths of said coal, and an account of· such as has been taken out by others, they must be made in such case defendants, and leave must be given the plaintiffs in a reasonable time to make them defendants by an amended bill; and in case of such election, the said John Alderson's administrator and heirs must refund to James Putney so much of the purchase money as has been paid by him, and the interest thereon, as exceeds the one-sixth part thereof, as this contract expressly provides, that in case of loss John Alderson was to refund only in proportion to the amount lost and the price therein agreed to be given per acre.   But if James Putney or those claiming under him, should, as they have a right to do in a reasonable time, to be fixed by the court, elect to have the contract made by him with John Alderson, April 10, 1851, rescinded and annulled, the court should so do, and decree the refunding to him of the money paid by him to John Alderson under this contract, but should at the same time decree, that the defendants, who are in possession of this seventy and three-fourths acres of land or any part thereof, should restore to the heirs of John Alderson, to be held by them for themselves and the other heirs of George Alderson or those claiming under them, this seventy and three-fourths acres of land ; and should enforce the delivery of such possession by a writ of *haberi facias possessionem*, so as to restore all parties to the position in which they were when this contract of April 10, 1851, was made ; and in such case, the plaintiffs' bill must be dismissed at their costs.

But whatever decree is entered by the circuit court, when this cause is remanded, it must be without prejudice to the plaintiffs or any of them, or the defendants or any of them, instituting any suit or suits in law or equity, that they may be advised is proper, to enforce their rights, or supposed rights, as claimants of this land, or any part thereof, by virtue of the patent to James

Putney, or any tax deed or deeds, or other deeds, or to enforce any rights they may respectively have against any persons by reason of the making of the deed of partition of this land, or any other deeds or conveyances thereof, or any equities or rights which may have arisen in whole or in part from such conveyances; and and if the contract between John Alderson and James Putney be set aside, the decree then entered must be without prejudice to the heirs of John Alderson or any person claiming under them, or the heirs of George Alderson or those claiming under them, instituting any suit in law or equity, which they may be advised is proper, to enforce an account of rents and profits or of coal mined or removed from this land, without prejudice to the plaintiffs instituting any suit in law or equity, which they may be advised is proper, against the administrator and heirs of John Alderson for any claim they may be supposed to have against them or any of them resulting from the setting aside of said contract.

The decree of the circuit court of Kanawha county of December 12, 1874, must therefore be reversed and annulled; and the appellants must recover of the appellees, other than the administrator and heirs of John Alderson, their costs in prosecuting this appeal; and this cause must be remanded to the circuit court of Kanawha county with directions to be further proceeded with upon the principles and instructions laid down in this opinion, and further on the principles governing courts of equity.

THE OTHER JUDGES CONCURRED.

DECREE REVERSED.    CAUSE REMANDED.