470 · Parkersburg Industrial Co. v. Schultz et al.

# CHARLESTON.

Parkersburg Industrial Co. v. Schultz, et al.

Submitted February 4, 1897—Decided April 24, 1897.

1. Adverse Possession—*Continuity—Title.*
   Mere naked possession of land without claim of right is no adverse possession, and, no matter how long continued, will not furnish a defense to an action or confer title. (p. 472.)

2. Adverse Possession—*Inclosure—Improvements.*
   One in adverse possession of land without paper title has adverse possession only to the extent of his inclosure or actual improvement. (p. 472.)

3. Adverse Possession—*Inclosure—Partial Inclosure.*
   Possession by inclosure, to be adverse, must be such as to be exclusive possession, a real and substantial inclosure, an actual occupancy, which is definite, positive, and notorious, when that is the only defense against a legal title. Therefore a partial inclosure of land capable of total inclosure, leaving part of its boundary open, is not sufficient. (p. 473.)

4. Adverse Possession.
   A party relying on adverse possession must show clearly all the requirements of the doctrine. (p. 473.)

5. STATUTE OF LIMITATIONS—*Title—Ejectment.*

The statute of limitations confers a legal title, enabling one not only to defend but to maintain ejectment or other action on its strength. (p. 475.)

6. EJECTMENT—*Title in Stranger—Burden of Proof—Evidence.*

To defeat an action of ejectment by an outstanding title in a stranger, the defendant must show it to be a present, subsisting, operative legal title, on which the owner could recover if asserting it in an action. It is not for the plaintiff to disprove its validity. (p. 476.)

7. TITLE—*Statute of Limitations—Forfeiture.*

Title vested under the statute of limitations may be forfeited for nonentry for taxation or lost by adversary possesion under the statute of limitations. (p. 481.)

8. ADVERSE POSSESSION—*Continuity—Subsequent Entry.*

Adverse possession is lost by break in its continuity, by abandonment, or other cause, before the bar of the statute is complete, and seisin is restored to the true owner. A subsequent entry is a new disseisin, and cannot be added to the former possession. (p. 474.)

9. INSTRUCTIONS—*Hypothetical Instructions.*

Instructions must not be obscure, or vague and indefinite, or put inconsistent legal propositions, or propositions which no evidence fairly presents, or be inconsistent with others in the case, or present a certain hypothesis and make the case turn wholly on it, disregarding another hypothesis fairly arising on the evidence. (p. 482.)

10. EVIDENCE—*Claim—Title.*

Declarations of one in possession of land explanatory of such possession, as under what right or claim, are admissible to show his claim, but not to show title. (p. 473.)

11. CONSTITUTIONAL LAW—*Forfeiture.*

Is the statute forfeiting tracts of less than one thousand acres of land constitutional? (p. 478.)

Error to Circuit Court, Wood county.

Ejectment by the Parkersburg Industrial Company against Otto Schultz and others. From a judgment for defendants, plaintiff brings error.

*Reversed.*

MERRICK & SMITH, for plaintiff in error.

L. D. TURNER and H. P. CAMDEN, for defendants in error.

BRANNON, JUDGE:

This is an action of ejectment brought by the Parkersburg Industrial Company against Otto Schultz and others to recover six coterminous town lots, numbered from seven to twelve, inclusive, containing one hundred and twenty-six poles in the aggregate, lying near the mouth of the Little Kanawha river, on the south side of it from Parkersburg. The plaintiff traced title from the State of Virginia under two patents,—one to James Neal, dated September 14, 1785, for four hundred acres, and one to John Stokely, for one thousand two hundred acres, dated May 9, 1804. In the line of this title was a deed from Stokely to J. B. Beckwith, dated November 2, 1844, for two hundred and twenty-five acres and ninety-seven poles. The defendants showed no paper title, but relied solely on adversary possession under some claim under Elijah Spencer, and an outstanding title, under a grant from King George III. to Daniel Richardson and others, dated December 1, 1773, for twenty-eight thousand four hundred acres of land.

We must now inquire into this defense of adversary possession. Where one man has actual possession of land of another, if he makes no claim to own it, he is merely an intruder, called commonly a "squatter," and, no matter how long he may continue there, the statute of limitations will confer no right upon him, because he makes no claim against the true owner and his possession is, therefore, not adversary. *Creekmur* v. *Creekmur*, 75 Va. 430; *Nowlin* v. *Reynolds*, 25 Grat. 141; *Hudson* v. *Putney*, 14 W. Va. 561, point 4; Hutch. Land Titles, § 408; *Kincheloe* v. *Tracewells*, 11 Grat. 588, point 7. If, however, he claims ownership in the land, though he have no writing giving color of title, the statute does run in his favor, and at the end of the period of limitation prescribed by it will give him title, but only to the extent of his inclosure or improvement. *Core* v. *Faupel*, 24 W. Va. 238, point 7; *Jarrett* v. *Stevens*, 36 W. Va. 445 (15 S. E. 177); *Oney* v. *Clendennin*, 28 W. Va. 34, point 4. If he have a writing, giving color of title, his possession goes to the extent of the boundaries specified in it where there is no actual adverse possession under the better title within it. Code 1891, c. 90, s. 19; *Oney* v.

*Clendennin*, 28 W. Va. 34. Possession under writing imports that it is under claim of title and adverse, and will go to its boundaries. *Ketchum* v. *Spurlock*, 34 W. Va. 597 (12 S. E. 832). Spencer set up some claim to this land as shown by his mere declarations. Declarations of one in possession, explanatory of his possession and making claim, are admissible evidence, while he is in possession, to show that he is in under claim of ownership, but not to show title. *High* v. *Pancake*, 42 W. Va. 602 (26 S. E. 536); 1 Greenl. Ev. § 109; *Royall* v. *Lisle*, 60 Am. Dec. 712. Let us look at the character of possession in this case. There was no building, cultivation, or improvement upon this land. The only basis for adversary possession is an inclosure by a fence. Under the evidence the question presents itself whether this fence was such as the law contemplates to give adversary possession. Here we must first note that, as it defeats the true title, adversary possession must be taken strictly, and the facts to sustain it proven clearly. *Irvine* v. *McRee*, 42 Am. Dec. 468; *Hale* v. *Glidden*, 10 N. H. 402. The evidence shows that in 1843 or 1844 a fence, composed perhaps of slabs, inclosed two sides of these lots, but not the whole area. Certainly one side was left open. Our cases hold that adverse possession must be "exclusive"; that is, shut the adverse claimant out. In *Jackson* v. *Shoonmaker*, 2 Johns. 230, Chief Justice Kent said that a possession fence, by felling trees and lapping them one upon the other around the land, was "too loose" a mode of taking possession to be considered adverse possession. He said: "There must be a real and substantial inclosure, an actual occupancy, a *possessio pedis*, which is definite, positive, and notorious, to constitute an adverse possession, when that is the only defense, to countervail a legal title." Same in *Coburn* v. *Hollis*, 3 Metc. (Mass.) 125. In *Hale* v. *Glidden*, 10 N. H. 397, it was held that an inclosure by a brush fence and cutting wood from a wood lot, where a person had no color of title, is insufficient; the possession must be actual, permanent, and exclusive, marked by definite boundaries. In *Armstrong* v. *Risteau* (Md.) 59 Am. Dec. 115, it was held that fences on three sides of an oblong or square piece of land are not such an inclosure as would constitute adverse possession where such inclosure is necessary. See

Busw. Lim. § 247. Possession, to be adverse, must be actual, continued, visible, notorious, distinct, and hostile. It must be such that the owner may be presumed to have notice of it and its extent. It must be open, visible, and exclusive. *Core* v. *Faupel*, 24 W. Va. 238, point 5. It has been several times held that protection of the land by substantial inclosure sufficient to turn stock is necessary, and that it is not sufficient where it is insufficient to turn stock. Note to *Plume* v. *Seward*, 60 Am. Dec. 604. A poor fence around a part of this small area, leaving it open, with no building or cultivation, would not be distinct, hostile possession, excluding the owner, giving him warning of adverse claim, but would rather indicate an abandonment of a once-intended claim. Though from Spencer's declarations we may say he at one time set up a claim, yet he abandoned it, as he never completed this small inclosure. Other lots very close he kept inclosed, but let this go, evincing an abandonment.

Here comes in another point of weakness, forbidding us from considering this inclosure as conferring title. One of the indispensable elements of adversary possession is that it must be continuous for the whole period prescribed by the statute. It is indefinite when this possession began, but say 1843. As an inclosure it ended in 1853. The bulk of the evidence clearly shows this. One of Spencer's sons, living just there, possessing peculiar means of information, said he did not "remember of the land in controversy being fenced after 1853; we let the fence go." Other evidence fixes 1853 as the latest date at which, if ever, it could be considered such a fence as the law requires. Certainly we have to say that after that date it was neglected, and in fact abandoned, going into utter dilapidation. Some of its rails did continue there of course, and were burnt by the troops in the Civil War, in 1861, but they were simply remnants of what had been for years a skeleton of its former self. Thus there was only ten years of adversary possession, if any ever existed, and to confer title the then existing law required fifteen years. The present period of ten years first began with the Virginia act of March 27, 1861. Hutch. Land Titles, § 443. To confer title by the statute of limitations, it is indispensable that the possession be unbroken and continuous for

the period of the statute. *Core* v. *Faupel*, 24 W. Va. 239; *Oney* v. *Clendennin*, 28 W. Va. 34. Ever so short a break will destroy all the preceding holdings, and the possession must begin *de novo*. Hutch. Land Titles, § 378; *Downing* v. *Mayes* (Ill. Sup.) 38 N. E. 620. So, if there be a voluntary abandonment before the bar is complete, the possession amounts to nothing. *Taylor's Devisees* v. *Burnsides*, 1 Grat. 165; *Armstrong* v. *Morrill*, 14 Wall. 146. But suppose, as claimed, the possession continued down to 1860 by inclosure, then the statute would have conferred title on Spencer, for the statute itself confers and invests title in the occupant as effectually as does descent, devise, or grant, so that he may not only defend, but, if afterwards another enter upon the land, he may maintain ejectment on the title conferred by the statute, though he have not the scratch of a pen to show title. *Garrett* v. *Ramsey*, 26 W. Va. 345, point 4; 1 Am. & Eng. Enc. Law (2d Ed.) 883; Hutch. Land Titles, pp. 237, 238; *Bicknell* v. *Comstock*, 113 U. S. 150, (5 Sup. Ct. 399); Busw. Lim. § 229; Wood, Lim. Act. 498. When once vested, the title cannot be lost by mere abandonment. *Mitchell* v. *Carder*, 21 W. Va. 277. But, like any other title, a title acquired by adversary possession may itself in turn be destroyed by adversary possession. Now, if Spencer had so acquired such title, it was lost long before this suit by adverse possession, within the bounds of the Beckwith tract, of two hundred and twenty-five acres and ninety-seven poles. For more than ten years there was actual possession of it under the Beckwith right, under which the plaintiff claims, by inclosure and cultivation of a field of thirty-five acres, erection of a mill, and many accompanying acts of ownership at different times, such as taking timber and rock hauled over the very land in controversy. True, possession was not on these particular lots; but, in the absence of their occupation (and it is not claimed that it continued longer than 1860), this possession under the Beckwith claim spread over these lots and defeated this hostile title supposed to be acquired under the Spencer claim. So I see nothing under the head of adversary possession to defeat the title of the plaintiff.

But it is said that the plaintiff cannot succeed because of the said patent from King George III, as it shows an

older outstanding title. This title is a stranger to all the parties in this suit, as none of them connect with it. It is settled law that the plaintiff in ejectment must recover on the strength of his own title, and not on the weakness of his adversary's title, and therefore, if a valid title be shown to exist in a third party, though the defendant is not entitled to it, yet it defeats the plaintiff; but it is not merely elder title that will defeat the plaintiff, for it must be a present, subsisting, and operative legal title, on which the owner could recover if asserting it by action. *Reusens* v. *Lawson*, 91 Va. 226 (21 S. E. 347). But is the defendant to show facts to show that it is still a good title? or, when he presents this grant, is it presumed to be good until the plaintiff repel it? In the long lapse of time since this King George grant issued, we have had many laws forfeiting and selling lands for delinquency and omission, and as a matter of history we know that many of these old grants are extinct under these laws. Vast estates have been thus sunk in the sea of time under these laws since the date of that grant. Say that a plaintiff has shown a right to recover as between him and the defendant, the defendant says the true right is in a stranger. It is his plea. He must make it good. Newell on Ejectment (p. 652) says that "a defendant who sets up an outstanding title in a third person as a defense to an action for the recovery of the possession of real property must show that such title is still a living and effective title, not barred by the statute of limitations, or in any other way ineffectual or void." We have the high authority of the United States Supreme Court in *Greenleaf* v. *Birth*, 6 Pet. 302, for this language: "In the case before the court the defendant [meaning plaintiff] has shown *prima facie* a good title to recover. The defendant sets up no title in himself, but seeks to maintain his position as a mere intruder by setting up title in third persons with whom he has no privity. In such a case it is incumbent upon the party setting up the defense to establish the existence of such an outstanding title beyond all controversy. It is not sufficient for him to show that there may be possibly such a title. If he leaves it in doubt, that is enough for the plaintiff. He has a right to stand upon his *prima facie* good title, but he is not bound to furnish any evidence to assist the defense.

It is not incumbent on him negatively to establish the non-existence of such an outstanding title. It is the duty of the defendant to make its existence certain." No possession under this old grant was shown; nothing as to its taxation; simply the dry grant. That was not enough. Moreover, the possession of the Beckwith tract for more than ten years defeated the older right under the King George grant, and for that reason it was not a subsisting grant as against the Beckwith right. That possession under the Beckwith right, though not on the lands in controversy, extended to the boundaries of the tract, covering the land in controversy, under authorities above shown, as Beckwith was in actual possession of his land, which constituted an interference or an interlock, if we call it such. No possession anywhere was shown under the King George patent. It cannot be questioned that the King George patent covered all the Beckwith tract, as it calls for the mouth of the Little Kanawha, and runs up it and down the Ohio far enough necessarily and indisputably to include the Beckwith tract.

It is argued that the right of the defendants, if any was acquired by possession, has become forfeited for non-entry for taxes, and that this right vests in the plaintiff under the Beckwith title to the two hundred and twenty-five acres, because that tract had been in possession for five years and taxes paid before this suit began. I think this is clearly so, because this land was never on the tax books until 1884 under this Spencer claim, and chapter 125, s. 7, Acts 1869, found in section 34, chapter 31, Code 1868, would forfeit it. If it be said that section 6, Art. XIII., of the Constitution of 1872, operates to withdraw the years 1870, 1871, and 1872 from computation in the forfeiture of tracts of less than one thousand acres under said act, I answer that it may be so as to lands not completely forfeited when the Constitution took effect, August 15, 1872, yet not so as to tracts which, under the act of 1869, had become completely forfeited, and vested in the State, as this had. It did not intend to include those years after 1869, so to operate on lands already forfeited, because section 3, Art. XIII., of the same Constitution, made provision as to land then already forfeited by transferring it to certain persons (and under this the owners of the Beckwith

title would get the forfeiture title), and selling that not transferred. So the Constitution only withdrew those years from operation to forfeit as to tracts in process of forfeiture. The land claimed by the defendants would also be forfeited under Acts 1872–73, p. 331, c. 117, for five years' omission after 1872, and would vest in the Beckwith title under the same act (*Id.* p. 332) if that clause forfeiting tracts of less than one thousand acres be constitutional. It is not necessary for the purposes of this case to decide that point. Speaking for myself, I cannot rid myself of a doubt, long entertained, whether statutory provisions, enacted since the Constitution of 1872, forfeiting tracts of less than one thousand acres for non-entry are Constitutional. The Constitution of 1863 (Article IX., sec. 4) released taxes since 1831 on tracts where the amount was less than twenty dollars, and released all tracts of less than one thousand acres forfeited for non-entry since 1831 (if there were any), thus evincing a policy to forgive small tracts because the State would not lose much thereby, but chiefly because small tracts had been as a general thing settled upon, and on them were the homes of our people, whereas the large tracts were wild and owed large taxes, and prevented the settlement of the country, and it was necessary for the progress of the country to remove them out of the way of settlement and improvement. The act of 1869 forfeited all tracts for non-entry without regard to quantity, but the Constitution of 1872 (Article XIII., sec. 6), while it declared that owners should put all tracts, whether under or over one thousand acres, on the tax books, yet, when it denounced the penalty of forfeiture for failure to do so as a rule for all future time, it applied it only to tracts of over one thousand acres, thus reasserting the wisdom of the same policy inaugurated in favor of small tracts by the first Constitution. This Constitution of 1872 carfully divided tracts into two classes,—one, those tracts containing one thousand acres or more; the other, those containing less than that amount,—and, as a rule for the future, denounced forfeiture against only one class. Why does not this come under the rule of construction that the expression of one thing is the exclusion of another? It is a strong case of implied prohibition. It seems unreasonable to say that, when the convention and

people took up this subject of the forfeiture of lands for non-entry, and divided them into two classes, and fulminated the penalty of forfeiture against only one, as a rule and policy for the future, it left it to the legislature to impose forfeiture on the other. It seems to me this act contravenes the plain policy and rule of the Constitution. It is true this prohibition against the forfeiture of small tracts is only by implication, but is it not a strong and plain implication? An act may be void, as against the plain implication of the constitution, as well as when it is against its expression. Cooley, Const. Lim. p. 78, says: "Another rule of construction is that, when the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other cases." Chief Justice Thompson said, in *Page* v. *Allen*, 58 Pa. St. 346: "The expression of one thing in the constitution is necessarily the exclusion of things not expressed. This I regard as especially true of constitutional provisions not declaratory in their nature." Such is the character of the provision under discussion. See End. Interp. St. § 533, and *Donaldson* v. *Voltz*, 19 W. Va. 156. Did the Constitution of 1872 repeal the forfeiture clause of the act of 1869? That act says that omission for years both prior and subsequent to 1869 shall forfeit, while the Constitution says that only years subsequent shall do so. They are repugnant as to tracts of one thousand acres. But did the act yet operate as to tracts of less? If so, years prior to 1869 counted against them, and those prior years ran against the small tracts, and not against the large. This can not be. The intent was that years prior to 1869 should not count in either case. I use this argument to show that the convention took up this subject of forfeiture for omission, and imbedded in the Constitution a full and complete provision on the subject, covering the whole subject, and said just where, in the future, it intended to employ the harsh remedy of forfeiture, denouncing it against some tracts, and by strong implication prohibiting it as to others for the future, and thus repealed the old rule and instituted a new. *Herron* v. *Carson*, 26 W. Va. 62. This remedy by

forfeiture is the most drastic, severe, and terrible remedy which the state can adopt against its land owners, and ought we not to lean in favor of that construction which would narrow rather than extend its application?

### INSTRUCTIONS.

The court erred in refusing plaintiff's instruction No. 1, to the effect that the defendants, in making out their defense under the statute, were required to show under what color or claim of title they relied, and also that such adverse possession in the premises continued unbroken for the full period of ten years before the institution of this suit; that, if they relied on adversary possession as completed before March 27, 1861, then they must show its continuance unbroken for the period of fifteen years. Principles stated above show that this instruction should have been given. Instead of giving it, the court substituted one saying generally that adversary possession for ten years was sufficient, without discrimination as to whether the bar was supposed to be complete before or after the act of 1861, and in the face of the fact that there was no evidence tending to show any continuance of possession after that act, and that would require fifteen years, whereas that instruction fixed ten.

Under principles above stated, it was error to refuse to give plaintiff's instruction No. 7, stating that, though the David Richardson patent was prior to the Neal and Stokely patents under which Beckwith claimed the two hundred and twenty-five acres and ninety-seven poles, yet that if Beckwith, prior to the conveyance made to him by William Bently, trustee, and for ten years prior to the institution of this suit, had actual possession of said two hundred and twenty-five acres and ninety-seven poles under the David Richardson patent then the Richardson patent would not interfere with the recovery of the land by the plaintiff.

The court erred in giving defendants' instruction No. 3, telling the jury that the David Richardson grant was the oldest, and conferred title, and if it covered the land in controversy the plaintiff could not recover, unless the jury was satisfied that the land had been forfeited to the State for non-entry on the books, and for failure to pay taxes

thereon. There was no evidence touching this matter. It was for the defendant to show its entry for taxes. The defendant had no right, on the showing made by him as to this King George grant to Richardson, to present a case on it. Another grave objection to this instruction is that it utterly ignores any reference to the evidence to show that possession under the Beckwith right adverse to the Richardson right entered into the question before the jury. It told the jury that the only thing that could defeat the old King George grant was forfeiture for taxes, closing its eyes to the fact that it might be defeated by actual adverse possession. An instruction cannot seize upon one fact, or one state of facts, and make the case turn solely on them, keeping the jury from inquiring into other facts material in the case under the evidence. *McCreery* v. *Railroad Co.*, 43 W. Va. 110 (27 S. E. 327); *Stors* v. *Feick*, 24 W. Va. 606; *Thompson* v. *Douglass*, 35 W. Va. 344, (13 S. E. 1015).

The court also erred in giving defendants' instruction No. 4, saying that if Elijah Spencer rented and took possession of the land in 1836, or shortly thereafter, claiming the same from the bank of the Little Kanawha river back to the foot of the hill called "Ft. Boreman," and inclosed and otherwise improved the same, and kept it enclosed for fifteen years, and that he and those under him continued to occupy openly and notoriously the premises, including the land in controversy, by the exercise of acts of ownership, claiming the same adversely for a period of more than ten years. then they must find for the defendants. This instruction, as applied to this case was very misleading. There is no evidence to show that Spencer ever rented to or from anybody. It was abstract in presenting any matter of rent, and was foreign to the case. There was no evidence tending to show that Spencer took possession of it in 1883 or shortly thereafter. There is no evidence tending to show that Spencer otherwise improved it. There was possession by Spencer and inclosure of land north of an alley there, which was not the land in controversy; and this instruction imports that such inclosure upon that land, although he had no inclosure or improvement on the land in controversy, and no paper title, would still spread over the land in controversy,

whereas he could only hold by actual inclosure. And then it propounds two different periods of limitations, ten and fifteen years, because it goes on to say, "And kept the same inclosed for a period of 15 years," and afterwards says, "And claimed the same adversely for a period of more than 10 years before the institution of this suit." Now, which period did the court intend to tell the jury applied,—ten or fifteen years? One instruction must not be inconsistent with another. Much graver is the objection where it is inconsistent within itself. How can we say whether the jury acted on the ten year or the fifteen year period? We could not say, under that instruction, on which the jury acted; and an instruction capable of two constructions, one of which is erroneous and may mislead the jury, should not be given. *Gas Co.* v. *Wheeling*, 8 W. Va. 323, point 12; opinion in *McMechen* v. *McMechen*, 17 W. Va. 703; *Barnett* v. *Lumber Co.*, 43 W. Va. 441 (27 S. E. 209). Again, we may say this instruction is inconsistent with the fixed period of ten years in the substitute instruction for plaintiff's No. 1, and instructions must not be inconsistent with each other. A bad one is not cured by a good one. A bad instruction should be withdrawn. *McKelvey* v. *Railroad Co.*, 35 W. Va. 500 (14 S. E. 261). It is bad, too, in not defining adverse possession, and leading the jury to say that mere acts of ownership constitute adverse possession, without defining and explaining to the jury what kinds of acts of ownership, and under what circumstances they constitute adverse possession.

I cannot see that defendants' instruction No. 7 is bad. I do not see that a defendant who relies simply on possession under claim of title, without showing color, has to in any way particularize what his claim of title is, so he claim it in connection with possession.

The court gave, for defendants, instruction No. 8, that if Spencer acquired adverse possession to the premises shown in red on the plat, "in the manner defined in these instructions,"—that is, for fifteen years prior to 1861, or ten years since 1861,—then his failure to keep up his fences after his posssession had so ripened into title will not constitute an abandonment of his right to so much of the land as remained inclosed, if he continuously remained on the premises which he had formerly inclosed. Now,

the red on the plat included certain lots north of an alley which Spencer unquestionably inclosed and resided upon, and included the lots in controversy south of that alley, which were not inclosed except in the manner above stated, and the inclosure of which ceased (with the very latest possible date, as claimed by the defendants) in 1860, while the possession of the lots north of the alley continued. This instruction would lead the jury to say that the continued occupation of those lots north of the alley would extend to the others, though there was no improvement thereon, and the fence had ceased to exist, and the inclosure never was such as to give adverse posession. It would give the defendants the benefit of the inlosure of other land, as to the land in controversy, and they were not entitled to the benefit of the inclosure of such other lands. And, again, no instruction defined adverse possession, though this instruction appealed to them for the manner of acquiring adverse possession. Then there was no evidence tending to show adverse possession by actual occupation for any time after 1861, and the instruction was foregn to the case as to that. The evidence fairly presented no such case, and this instruction fixed fifteen years as the limit prior to 1861, and it is inconsistent with the ten-year limit fixed by the substitute for the plaintiff's instruction No. 1. And what does it mean by saying, "If he continuously remained on the premises which he had formerly inclosed"? There is not a particle of evidence to show that Spencer, or any one for him, before this suit, lived a moment on the land in controversy, or improved it, or in any wise remained on it; and hence we must construe that language as meant to refer to other land north of the alley on which Spencer did remain, and which was inclosed, —different land from the land in controversy,—thus giving the defendants the benefit of possession of that land, although it was utterly vacant, fenceless, houseless, and without improvement. It is true that, after title has become perfected under the statute of limitations, then mere failure to keep inclosed is immaterial, for the party has good title without further continuous possession until he is deprived of it by some adversary possession. He cannot, however, abandon or discontinue his inclosore while the statute is running in his favor until the term fixed by it as

a bar shall have fully elapsed. The instruction was vague in some of its features, abstract in some, inconsistent with a former instruction, and misleading.

Therefore we reverse the judgment, set aside the verdict, and grant a new trial.

*Reversed.*