# CHARLESTON.

ROSENOUR *v.* ROSENOUR *et al.*

Submitted February 1, 1900—Decided March 24, 1900.

1.  MARRIED WOMAN—*Oral Contract.*
     An oral contract by a married woman for the sale of her land cannot be specifically enforced under the doctrine of part performance.    (p. 558).

2.  WRITTEN CONTRACT—*Acknowledgment—Performance.*
     A written contract by a married woman for the sale of her land, unless living separate and apart from her husband, cannot be specifically enforced unless acknowledged by her before an officer authorized to take such acknowledgment.    Her husband must join in the contract.    (p. 558).

3.  BILL—*Contract—Specific Performance—Decree.*
     Where a bill in equity is filed alleging a contract for the sale of land, but admitting that the contract is so imperfect as not to be capable of specific performance, and asking repayment of purchase money and compensation for improvements, no decree of specific performance can be made on such bill without an amended bill seeking that relief.    (p. 561).

Appeal from Circuit Court, Tucker County.

Bill by Mox Rosenour against Henry Rosenour and others. Decree for plaintiff, and defendants appeal.

*Reversed.*

A. B. PARSONS and L. HANSFORD, for appellants.

JOS. T. HOKE asd WM. G. CONLEY, for appellees.

BRANNON, JUDGE:

This is a bill in equity in the circuit court of Tucker County by Mox Rosenour against Henry Rosenour, Susan Rosenour, and James B. Reese. The bill states that Mox Rosenour is the son of Henry Rosenour. by a first wife, and that while she was living Henry Rosenour purchased a tract of land on Red creek, Randolph County, with means belonging partly to Mox Rosenour's mother, though the land was conveyed to Henry Rosenour, but that he always acknowledged a right in his wife to an interest in the land; that Henry Rosenour sold this land, and after the death of his first wife he told the plaintiff that he was entitled to receive out of the said sale five hundred dollars as his mother's share of the land; that some time after the sale of the farm the father married a second wife, Susan Rosenour; that later Henry Rosenour bought of Reese one hundred and eighty-eight acres of land in Tucker County, that Henry Rosenour paid all the purchase money for this land, and that Susan Rosenour paid no part of it, because she had no funds to do so; that said Tucker County land was paid for out of money arising from the sale of the farm in Randolph County, in which Mox Rosenour claimed said five hundred dollars interest; that a few days after Henry Rosenour purchased the one hundred and eighty-eight acres in Tucker County, he sold by written contract, dated 10th March, 1893, one hundred acres of said one hundred and eighty-eight acres to Mox Rosenour; that the plaintiff, Mox Rosenour, is illiterate and unable to read, and that he supposed the writing was a complete contract for the sale of the one hundred acres, and that the land would be paid for out of the five hundred dollars due the plaintiff from the sale of the Randolph farm, but that the plaintiff had learned that said written contract was so ambiguous

that he could not enforce the same by specific performance; that, relying, however, on that written contract and the representation of his father that he would convey to him (the said Mox Rosenour) said one hundred acres, and pay for it out of money due him from his mother's estate in the hands of his father, the plaintiff had taken possession of the one hundred acres, which was unimproved, claiming title thereto under said contract, and had built a house thereon as a family home, and cleared and fenced and otherwise improved eleven acres, costing him five hundred and seven dollars; that Bowman, a surveyor, was employed to survey the one hundred acres, and had made a plat thereof, giving boundaries; that after he had so improved said one hundred acres, and lived upon it for three years, and after his father had collected the money from the plaintiff's mother's estate in Randolph County, said Henry and Susan Rosenour conspired to cheat and defraud the plaintiff out of his land and improvements, by having the one hundred and eighty-eight acres conveyed to Susan Rosenour from said Reese. The bill charged that the purchase of the one hundred and eighty-eight acres was in the name of Henry Rosenour, and that the deed was likewise, but that Henry Rosenour had changed the deed so as to make the conveyance to his wife, (Susan); that then Henry Rosenour repudiated his contract with the plaintiff, and refused to make the plaintiff a deed for said one hundred acres, or to pay him for his improvements thereon, and refused to pay any damages by reason of the breach of his contract and his fraud in having said deed made to his wife, by reason whereof the plaintiff claimed that he had suffered damages in the sum of seven hundred dollars. The bill alleged that Henry Rosenour was insolvent; that said deed to Susan Rosenour was not on record, and, so far as appears, the legal title was yet in Reese; that at the request of Henry Rosenour, Reese had changed the name in the written contract of purchase of the one hundred and eighty-eight acres from Reese, and also in the said deed, by rubbing out the name "Henry," and inserting in its place the name "Susan;" and that the deed was withheld from recordation to defraud the plaintiff and other creditors. The bill prayed, as specific relief, that the court as-

certain the value of improvements put upon the land by
Mox Rosenour and the amount of damages sustained by
him by reason of the breach of said contract; that a decree
for the same, and also for the five hundred dollars due from
his mother's estate, be entered against Henry Rosenour;
that the deed from Reese to Susan Rosenour be held fraud-
ulent as to the plaintiff's demand; and that the one hun-
dred and eighty-eight acres be charged with the same, and
sold for payment thereof. The bill also contained a prayer
for general relief. Henry and Susan Rosenour answered,
denying in toto the material elements of the plaintiff's
case. Susan Rosenour demurred to the bill, specifying as
grounds that the contract of sale between Henry and Mox
Rosenour is not valid, and that it is not such an instrument
as can be specifically enforced; because the demand is not
such as can be enforced against land of Rosenour; and be-
cause the property sought to be charged is her separate
property, and never the property of Henry Rosenour.
The court entered a decree compelling Susan and Henry
Rosenour to execute to Mox Rosenour a deed for the land,
from which decree Susan Rosenour appealed.

As a very unique specimen of drafting,—a legal curios-
ity,—as well to show that it is so uncertain and imperfect
as to forbid a decree of specific performance, the written
contract is here inserted:

> this article af agrieement mad
> and entered on the 10 day oi march
> 1893 by an beteen S R
> and mox Rosenour one hunder acers of
> land beond the other
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
> Reese Serva excep the saw
> timber and the oild works
> Susan Rosenou
> three hundred and teenty
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
> Mox Rosenou
> Samp Pennington
> Tean Pennington

The stars represent words indistinct in the folds of the
paper, which the clerk could not make out and copy.

This paper denies the statement of the bill that it was signed. Henry Rosenour's signature does not appear. It is not pretended that Susan Rosenour signed it. Its execution is not proven. The subscribing witnesses deny it,—know nothing about its execution. Such as it is, it is false under the evidence; but, if genuine, it is a simple nullity, so far as specific execution is concerned, because a contract which a court of equity will specifically enforce must be certain as to the description of the property, and the uncertainty of this instrument is such that it [1]cannot be removed by extrinsic evidence. *Mathews* v. *Jarrett*, 20 W. Va. 415; *Westfall* v. *Cottrill*, 24 W. Va. 763. There is no basis for extrinsic evidence under this contract. However, the bill does not proceed for relief on this writing. It admits that it does not call for specific performance.

Can the decree be vindicated on the theory of an oral contract? What oral contract? Is it that represented by that written contract? If so, where is the description of the land? If you want to say that you will convert this abortive written contract into an oral one, you cannot do so, because you cannot use it to prove any contract. You must have something else to define the land. An oral contract must have fully the same certainty, or capacity of being given certainty by oral evidence, as a written contract. *Gallagher* v. *Gallagher*, 31 W. Va. 9, (5 S. E. 297). If we say that after this contract Henry Rosenour sent a surveyor to the land, and had him to survey out this one hundred acres, and give it metes and bounds, which it never had till then, though the alleged contract had been made long before, the answer is that Mox Rosenour never took possession under a contract supposed to date from that survey, because he was already in possession, and in order to warrant specific performance of an oral contract for the sale of land there must be actual possession taken under it,—a possession attributable alone to that contract, not mere continuance of possession under some antecedent right. We cannot say that survey gave definiteness to the written contract, because that survey was made after that contract. It was not a part of that contract. Oral contracts are not specifically executed unless the evidence shows an agreement definite in terms, definite in the de-

scription of the land, and that evidence is clear and not conflicting. The evidence in this case is seriously conflicting. *Gallagher* v. *Gallagher, supra.* This case is a notable instance of the danger and uncertainty of decreeing performance of oral contracts,—the evidence frail, unconvincing, hard to understand, and very conflicting. The statute of frauds requires a writing to take people's land from them under the theory of a sale. Unfortunately, as I think, and the declarations of many illustrious judges confirm it, courts of equity, moved by a motive to defeat fraud, have introduced what is called the "doctrine of part performance;" but the courts have many times seemed to regret this repeal or nullification of the statute of frauds, and have been emphatic to say that the doctrine has been carried too far, and should go no further, and that a very plain case should be made to warrant its application. These declarations will warrant a court in demanding full, clear, and unconflicting evidence. I should have said above, as to the matter of certainty of description of the land that the case of *Crim* v. *England,* 46 W. Va. 480, (33 S. E. 310), cannot help the plaintiff; for there the Court would have held the contract too vague in decription for specific land, and only sustained it because it was a sale of a moiety, which required no further description.

Perhaps the circuit court rested its decree on the theory that the contract and deed for the one hundred and eighty-eight acres of land were in the name of Henry Rosenour, and were then changed to the name of his wife. This is hardly material; as there was no enforceable contract. Under this point the evidence of S. R. Blackman, who acted as agent for Reese in the sale of the land, is satisfactory and conclusive. He says that Henry Rosenour came to him to buy the land, and they agreed; that he drew a contract of sale in the name of Henry Rosenour as purchaser, as he could not well understand Henry Rosenour, who was an immigrant from Europe, but Rosenour kept shaking his head and saying it was not right; and that he then asked Mox Rosenour, and Mox said it was "Susan," and Blackman did not know who she was, and Mox said she was his father's wife. Blackman says that Mox said the land was to be in her name, as she owned the property that was to

pay for it, and thereupon Blackman said that it would be all right if the contract should be in her name. Blackman says the first contract was in her name, and he told Henry Rosenour that he would make the change, and that Henry Rosenour seemed satisfied, and paid one hundred dollars, and Blackman gave him a receipt in Susan Rosenour's name, and that receipt is filed. It is not sure, from Blackman's evidence, whether what is called the first contract was delivered and brought back shortly thereafter, or whether the first contract was even signed, but he says that at the very time when that first contract was drawn it was understood to be wrong, and as the receipt for the one hundred dollars bears the same date, I would conclude that it was not delivered and then brought back. Be this as it may, Blackman is distinct in saying that Henry Rosenour was dissatisfied, and that he (Blackman) agreed to change it before any money was paid, and thus the true contract was a purchase in the name of Susan Rosenour. Blackman says that the true contract is filed in this case, and that is in Susan Rosenour's name. Blackman says that he directed Reese to make a deed under the contract. Reese lived elsewhere. He sent a deed in the name of Henry Rosenour. Blackman, having in his possession the deed for delivery, informed Reese of the mistake, and Reese authorized him to change it to the name of Susan Rosenour, which he did before delivery. Thus it seems reasonably clear, from disinterested testimony, that contract and deed were in the name of Susan Rosenour, and not put to her name fraudulently and, what is more, it is clear from Blackman's testimony that Mox Rosenour knew that the contract was in her name, was present when the mistake in the draft was corrected, and helped in its correction. Therefore, when he made the alleged contract with his father, he knew his father did not own the land. If he went on that land, and expended labor thereupon, he did so with full knowledge that his stepmother owned the land. He so stated to a disinterested witness (Blackman).

We have seen that the title papers vest in Susan Rosenour a separate estate in the land, if we can say there is, strictly speaking, a separate estate these days. She owned the land. The decree is erroneous, because it compels a

married woman to specifically execute what? A written contract? She signed none. An oral contract? Mox Rosenour puts no oral contract made by her into his bill. The bill does not go upon that theory, either as to Henry Rosenour or Susan Rosenour. Most certainly it states no oral contract with her. The only contract it pleads is one with Henry Rosenour. Moreover, Mox Rosenour not only does not state in his bill any contract, written or oral, with Susan Rosenour, but, on the contrary, states as a witness that he had no contract with her. But, if he had an oral contract with her ever so clear and certain, it could not be enforced against her, because she is a married woman. Even a written contract, if not acknowledged by her, cannot be enforced; much less an oral one. *Moore* v. *Ligon*, 22 W. Va. 292; *Id.* 30 W. Va. 146, (3 S. E. 572). The reason is that at common law a married woman could not dispose of her land. She can now only do so so far as statute law enables her to do so; and only in the precise mode in which the statute authorizes her to do so. Formerly, under Code 1868, chapter 73, section 6, she could only pass her estate by privy examination, acknowledgment, and declaration, as provided in that chapter, and the writing effecting a sale or conveyance had no operation until such privy examination was recorded. So that section read. Acts 1891, chapter 23, made a change to an extent. That chapter of the Code, as amended by that act, is found in Code 1891, chapter 73. That act dispenses with a privy examination and declaration that the *feme* willingly signed the writing and does not wish to retract it, but it did not dispense with an acknowledgment by her; and note that the amended section 6, while it dispenses with recordation as a prerequisite to the operation of the instrument, yet it does require still that the instrument must be acknowledged before an officer by the married woman. She cannot sell or convey her realty by any oral contract. She cannot do so by any writing, except by one in which her husband unites (Acts 1893, chapter 3, section 3), and acknowledged by her as required by chapter 73. It is argued in this case that said act of 1893 changed this doctrine, because it took away her common-law disability. It did not remove all of her disability, save that it enlarged her capacity to contract, and made

her amenable to the jurisdiction of a common law court for the enforcement of her contracts, as she never had been until that act of 1893; yet that act does not touch that particular contract of a married woman by which she sells or conveys her real estate. That is governed by chapter 73, section 6. *Williamson* v. *Cline,* 40 W. Va. 194, (20 S. E. 917), has no application to the case.

But I suppose that the claim is that this doctrine, just spoken of, does not apply in this case because the one hundred and eighty-eight acres was purchased with the means of Henry Rosenour in fact, and therefore the land is to be regarded as his, though in the name of his wife. Blackman says that the purchase money, except one hundred dollars, was paid by an order to him given by Susan Rosenour on L. D. Strader, to be paid out of a judgment against Sampson Snyder. Thus she paid for it. But it is claimed that the means to pay for the land came from the sale of a farm on Red creek, in Randolph County, which Henry Rosenour purchased of Jacob Roy, and that in its purchase he used some money of the first wife of Henry Rosenour, to the extent of five hundred dollars, and that when she died Henry Rosenour acknowledged an interest in the land in Mox Rosenour, and when it was sold Henry Rosenour promised Mox Rosenour five hundred dollars out of its sale, and therefore he was entitled to that interest in the Tucker County land. I do not think that this is anything but a personal debt, if Mox Rosenour's version is true; but it is contradicted. The evidence of any such promise by Henry Rosenour is under very conflicting evidence. But, as to the claim that money of Mox Rosenour's mother was invested in the land, it is not proven. It is shown that in Europe she had no estate. Her husband was so poor, and she, too, that when he crossed the ocean she was unable to come, and not until he worked at Wheeling did he have means to bring her to him. It is proven that she was unable to invest five hundred dollars in this land. Her husband was an industrious, laborious man, who worked hard, and earned money at Wheeling; so that it is plausible to say he had means to buy the little Randolph farm, and wholly unplausible to say that she had any means to invest. It is not proven that she ever set up any claim. It

is proven that her sickness entailed upon her husband considerable debt; but more unfortunate to him still, as regards indebtedness, was the waywardness and irregular conduct of his son, Mox, bringing upon his father expense and distress. It is not necessary to specify his acts of waywardness. I refrain from so doing; but they serve to render his cause unmeritorious, and inspire the conviction that his cause is trumped up.

That Randolph farm was conveyed in July, 1892, by Henry Rosenour to his wife, Susan; so that it was her land when sold. This, perhaps, was to avoid a creditor as to a small debt; but that is not material now. If Mox Rosenour had no money in it, he could not complain of his father giving it to Susan Rosenour. She says that, when he married her, she had separate estate from her father, and it is proven that she had some; and she says that she devoted it to paying her husband's debts, and fully paid for the land. Suppose that is not so; if Mox Rosenour was not a creditor, he can lift no voice about the transaction. He can make no protest as to this conveyance. Nor can he, for the same reason, make any objection to his father settling the Tucker tract on Susan Rosenour. And then Mox Rosenour's claims are inconsistent. In his bill he predicates his claim upon the theory that his mother's money went into the Randolph land, not saying that his own money went into it; but in his evidence he says he worked at Wheeling along with his father, and made five hundred dollars, which he put into a savings bank, and that his father took this and put it in the Randolph land. Thus he has two sources—inconsistent sources—or claim for five hundred dollars in that land. Why did he not bring evidence of deposit in that bank? If he earned the money, it was his father's because Mox was an infant. It could constitute no debt, even if, after his father used it, he promised to pay Mox, as the promise would be without valid consideration. But the evidence is utterly conflicting as to that promise. It is not satisfactorily proven.

Mox Rosenour has abandoned the possession of the land. Why? Because he knew he had no just claim to it. When he left it, he declared he would never return. He changed his mind under some influence, and brought this suit; but

his leaving is a circumstance against him, as he would not have done so if strongly impressed with the justice of his claim. What has he lost? He poorly cleared about six acres, and built a little log house; but he lived on the land four years, and took four crops from it. His father did a great deal of the work on the house. Susan Rosenour paid some cash for the carpenter work on it, we know. She files and swears to an account against Mox for cash, and cash paid for fruit trees, roofing paper, nails. oats, plow, etc., amounting to more than three hundred and twenty-five dollars. This is her version under oath, and her husband corroborates her largely; so that, in this family quarrel and cross swearing, a court would hardly know what was the equity of the mere money account between the parties,—what the old people did for Mox Rosenour. But, judging him by the circumstances disclosed by the record, it is highly probable that he received all he was entitled to, if he could be said to have any legal claim, further than mere relationship, which cannot be said.

There is another objection to the decree, which I have concluded would reverse it. The bill confesses that the written contract of sale is so imperfect that the plaintiff is not entitled to specific performance of it, and, waiving such relief, goes entirely for money recovery for improvements and damages; but the decree is, not for such money recovery, but for specific performance. No prayer of the bill asks specific performance. I am aware of the well-known rule, stated in *Shoe Co.* v. *Haught*, 41 W. Va. 275, (23 S. E. 553), (Syl., point 6), that, without prayer for a particular relief, that relief may be given under the prayer for general relief, provided the relief asked is not inconsistent with the specific relief asked. In this case it is inconsistent. The bill asked for a money recovery, on the theory that there was no enforceable contract. The decree of relief can rest alone on the antagonistic theory; that is, that there was an enforceable contract. There is no other contract pleaded in the bill than that imperfect written contract, no contract save that attempted by it, and the bill waives relief on that contract. Therefore, we may say the bill states no contract at all as the basis for a decree of specific performance, and proceeds on the claim that there

was no such valid contract enforceable in equity and asks money compensation on the theory that the contract was abortive and not capable of enforcement. It is an elementary principle that matters not charged in the bill cannot be considered on the hearing, and no decree based thereon can be entered, though ever so fully proven. *Burley* v. *Weller*, 14 W. Va. 264. Now, such a decree works a surprise on the defendant. Perhaps not so much in this case, in fact; but it will not do to adopt such a precedent of framing the case on one theory and taking a decree on another inconsistent theory. I have no doubt that if the plaintiff changed his mind, and concluded that he was entitled to specific performance, he could amend his bill, as the matter would be sufficiently germane to the case to allow such amendment; but specific performance cannot in this case be decreed, except by the amendment of the bill. *Bird* v. *Stout*, 40 W. Va. 43, (20 S. E. 852). But "under the prayer for general relief the plaintiff cannot recover on a claim distinct from that demanded or put in issue by his bill." *Piercy* v. *Beckett*, 15 W. Va. 444. Where a party files a bill for specific performance, and it appears that he cannot have it, but is entitled to a rescission of the contract, and a recovery of money consequent thereon, in order to get a decree of rescission, instead of specific performance, he is compelled to amend his bill under several Virginia decisions. *Parrill* v. *McKinley*, 9 Grat. 1; *Bellon* v. *Apperson*, 26 Grat. 217; *Ferry* v. *Clark*, 77 Va. 397. In *Anthony* v. *Leftwich's Representatives*, 3 Rand. (Va.) 238, the bill was for specific execution, but the court was of opinion, on the pleadings and evidence, that it was not a case for specific performance, but allowed an amended bill to claim compensation for improvements put on the land by the purchaser, just as in this case.

Being of opinion that the plaintiff is entitled to no relief, we reverse the decree and dismiss the bill.

*Reversed.*