# CHARLESTON.

PICKENS *et al v.* STOUT *et al.*

Decided May 3, 1910.

1. PARTITION—*Title—Ouster—Between Tenants in Common.*

The defense of an ouster between tenants in common, effected by the possession of a stranger under a contract of purchase from one of the co-tenants, does not present a question of title of which a court of equity cannot take cognizance on á bill for partition of the land.

2. ACKNOWLEDGMENT—*By Married Woman.*

A married woman cannot divest herself of legal or equitable title to land, otherwise than by a deed or contract, acknowledged in the manner prescribed by the statute.

3. SPECIFIC PERFORMANCE—*Proceedings—Sufficiency of Evidence.*

To sustain a·demand in equity for specific performance of an oral contract of purchase of land, the evidence must be clear, full and free from suspicion.

4. SAME—*Contracts Enforceable—Contract for Purchase of Land—Completeness.*

To be enforcible in equity, a contract of purchase of land must be complete, fixing the price and terms as well as the identity if the land.

5. JOINT TENANCY—*Tenancy in Common—Adverse Possession—Ouster Between Co-Tenants.*

An ouster between joint tenants, tenants in common or co-parceners may be effected by open, notorious and exclusive possession of the land by a stranger, under a deed or an executory contract of sale, executed by one of the co-tenants to such stranger, purporting to convey or sell the whole thereof to the latter.

6. SAME.

Mere execution and delivery of such deed or contract is not of itself sufficient to work an ouster. To it there must be added express actual notice of the adverse claim and possession, or open, notorious, exclusive and hostile possession of the land by the grantee or vendee of which the true owner in cotenancy must take notice, and inquire by what right such dominion is exercised.

7. ADVERSE POSSESSION—*Possession of Tenant.*

If, when such vendee secures his deed or contract, a tenant is in possession of the land, holding under the true owners, and

continues to remain thereon, under an agreement of attornment to the purchaser, of which any true owner has no·notice, the possession of the vendee by such tenant is not adverse to such owner, but his possession becomes adverse from the date of the removal of such tenant from the land, if he himself openly uses it or substitutes new tenants thereon.

8. SAME.

In such case, the ouster is effected by the combined action of the vendor and vendee, but,·in law, the vendor may be regarded as the real actor and the title under which the estate was held in common as his color of title, of which the vendee may avail himself as a claimant under it.

9. PARTITION—*Title in Common Source—Presumption.*

When all the parties to a suit for partition claim title from a common source, title in such common source is conclusively presumed for the purpose of the suit, though no deed or other muniment of such title has been introduced as evidence or is known to exist.

10. LIMITATION OF ACTIONS—*Computation of Period—Disabilities—Infancy.*

The running of the statute of limitations against a person is not. interrupted by his death, and continues to run against his heirs, though they be infants, and, in such case, the heirs are not within the saving clause of said statute.

11. SAME—*Computation of Period—Disabilities—Infancy—Burden of Proof.*

The disability of infancy at the date of the accrual of a right of action must be shown by the party claiming the benefit thereof. To prevent the bar of the statute of limitations, an infant must show that the right of action accrued to him, while he was under such disability, and therefore, that it did not begin to run against his ancestor, if he claims the property in controversy by inheritance.

12. SAME—*Computation of Period—Disabilities—Infancy—Co-Tenants.*

The disability of infancy on the part of one or more tenants in common or coparceners, does not avail their cotenants who, though once under the like disability, have failed to sue for the recovery of their interests in the land within five years after the attainment of their respective majorities. Each is barred by the lapse of said period.

13. PARTITION—*Disclaimer of Co-Tenant—Effect on Subsequent Partition.*

A disclaimer, filed by an heir to an estate, in a suit for partition of the real estate of the ancestor, acknowledging advance-

ments to the extent of his full share of the estate in the life time of the latter, followed by a voluntary partition of a portion of the land in which those participating in it apportioned, assumed and paid indebtedness of the estate, precludes such heir and his assigns from participation in a subsequent partition of the residue of the lands.

Appeal from Circuit Court, Lewis County.

Bill by Celia T. Pickens and others against Benjamin B. Stout and others. Judgment of dismissal, and plaintiffs appeal.

*Affirmed in part. Reversed in part. Remanded.*

*Melvin G. Sperry,* for appellants.

*W. E. Haymond,* for appellees Krenn. *W. W. Brannon,* for appellee B. B. Stout. *A. B. Fleming, Charles Powell,* and *Kemble White,* for appellee South Penn Oil Co.

POFFENBARGER, JUDGE:

A bill for partition, filed in the circuit court of Lewis county, by Celia T. Pickens and others, heirs of Mary Martha Jarvis, deceased, to which Albert R. Bond and others, heirs of Chas. B. Bond, deceased, were defendants, likewise claiming right to partition, by proper pleadings, was dismissed, on final hearing, in so far as it seeks partition, and the heirs aforesaid have appealed.

The land involved had originally belonged to James M. Stout, the father of Mrs. Jarvis and Mrs. Bond, and consisted of about 400 acres. James M. Stout died in 1879, seized and possessed of other lands situated in Harrison county. His wife and seven children, Benjamin B. Stout, Elmer H. Stout, Mary Martha Jarvis, Sue J. Bond, Elizabeth C. Ward and James F. Stout survived him. The widow has since died. Soon after the death of James M. Stout, a suit in equity was instituted in Harrison county for the partition of his lands, the bill setting forth, as belonging to the estate, the lands in Lewis county as well as those in Harrison. No decree of partition was made in that suit. The estate was liable to some indebtedness which the personal property was insufficient to pay, and, in 1883, the Harrison county lands were partitioned by agreement, which agreement was executed by conveyances. The cause was, however, referred to a commissioner who reported an indebtedness to the administrator, B. B. Stout, one of the heirs, and this

indebtedness was apportioned among and assumed by the heirs in the partition, each portion being charged upon the lands conveyed. In that suit, Elmer H. Stout filed a paper in which he represented that he had received from his father, by way of advancement, his full share of the estate, and did not claim any interest therein. Accordingly, he took no part in the partition. The agreement was made among the other six heirs. This did not include the lands in Lewis county. Over these, B. B. Stout exercised control and oversight, with the consent of the other heirs, receiving the rents, issues and profits and paying the taxes, in so far as they were paid, until 1886. In that year, he sold one portion of the land, containing 245.5 acres, to Joseph Krenn and the residue thereof, containing 150 acres, to John Krenn, executing to each of them a title bond, which, though not acknowledged for record, was recorded in the clerk's office of the county court, April 19, 1896, the date on which they were executed. These lands were returned delinquent for non-payment of the taxes thereon for the year 1884 and sold in the year 1885 for such delinquency, B. B. Stout becoming the purchaser, but he took no deed under this purchase until 1893.

Soon after their purchase, the Krenns took possession of the land. On the 25th day of May, 1893, Stout obtained a tax deed under his purchase. On the 3rd day of May, 1894, he executed deeds to the Krenns. In 1898, the Krenns leased the land for oil and gas purposes to the South Penn Oil Company. That company has developed the property and found it to be productive of both oil and gas in large quantities. This bill was filed at January Rules, 1901, and all interested persons were made parties.

B. B. Stout defends under his purchase at the sale for non-payment of taxes. He has also procured deeds for all of the interests except that of the Jarvis heirs and a one-half interest, which was conveyed by Benton Stout, one of the heirs, to Chas. B. Bond and Taylor Ward. Ward conveyed his half of the Benton Stout interest to B. B. Stout. Said B. B. Stout claims also to have purchased from Mrs. Jarvis, in her life time, and C. B. Bond, in his life time, all of their interest, by verbal contracts. The Krenns and the South Penn Oil Co. predicate their defense upon the theory of adverse possession, as well as title acquired from Stout.

Demurrers to the bill were properly overruled. Whatever the title of James M. Stout may have been, B. B. Stout claimed under him and along with his co-heirs and could not allow the land to become delinquent and purchase it to their prejudice. He was under a duty to pay the taxes. This being true, it is immaterial whether the long delay in obtaining a deed under his purchase rendered it invalid or not. As all the parties must necessarily claim under the same title, all questions of title are cognizable in a suit for partition. There is no strange, adverse title involved, as color or otherwise, unless it be the deeds made in 1893 and 1894, and the period of limitation since their date has not elapsed. As to whether the title bonds, made in 1886 are color of title, or there has been sufficient possession under them, will be deferred for the present.

The decree does not expressly state the ground upon which relief was denied. It dismisses the bill, declaring the Krenns have perfect and indefeasible right and title to the land, setting forth the facts relating to the execution and recordation of said title bonds, but admitting that they were not entitled to be recorded. On the failure of· the court to say in its decree, whether or not the claims of purchase of the Jarvis and Bond interests, set up by B. B. Stout in his answer, praying specific performance of the alleged contract, by way of affirmative relief, and to dismiss said answers, counsel for the appellees base the contention that the court did not find adversely on these claims of purchase but there is incorporated in one of the briefs for the appellants what purports to be an opinion, delivered by the trial court, in which these claims are overthrown. The whole decree is here for review and, if it shall appear that the claim of title by adverse possession cannot be sustained, it will be necessary to inquire whether the decree can stand upon title by purchase. If title in the Krenns can be made out on either theory, the decree will be affirmed and it cannot be reversed unless both theories fail.

As there is no claim of purchase from Mrs. Jarvis otherwise than by a verbal contract, it is impossible that she could thus have parted with title to her land prior to the 15th day of September, 1887, for, until that time, she was a married woman, and therefore incapable of divesting herself of title to real estate otherwise than by a written instrument, acknowledged in

the manner prescribed by the statute. *Simpson* v. *Belcher,* 61 W. Va. 157; *Amick* v. *Ellis,* 53 W. Va. 421; *Rosenour* v. *Rosenour,* 47 W. Va. 554; *Moore* v. *Ligon,* 30 W. Va. 146; *Moore* v. *Ligon,* 22 W. Va. 292. On the 15th day of September, 1887, she procured an absolute divorce from her husband and two months later, lacking one day, Nov. 14, 1887, died of consumption, at her home in Harrison county, on the tract of land allotted to her in the partition of the Harrison county lands. There is much evidence tending to show that she was in a very feeble condition during the whole of this period and never away from her home, but once. Many witnesses say she made a trip on horseback to Randolph county in 1887, for the purpose of visiting relatives and returned in about two weeks. Shortly after her return, the disease of which she was suffering, had made such progress and she had become so feeble, that she was soon confined to her home. Mrs. McDonald says she went about the middle of August, was gone about two weeks, and, in about a week afterwards, was confined to her bed. Much of the evidence of purchase consists of oral admissions and declarations, said to have been made by Mrs. Jarvis. The greater number of the witnesses who testified to these admissions are members of B. B. Stout's own family, his wife and children. Mrs. Stout and her children say Mrs. Jarvis came to their house after her return from the visit to Randolph county, and some of them say she came for money due her on account of her Fink Creek lands, and that, on this occasion, she said she had procured her divorce. Mrs. Stout says she got $20.00, for which she gave a receipt, signing her name, Mary M. Stout, which receipt has been lost and cannot be found. Some of these witnesses place this visit to B. B. Stout as late as three weeks before her death. Mrs. Stout also thinks Mrs. Jarvis returned from her visit to Randolph county about the middle of October. Other witnesses whom she visited on that trip, as well as her daughters and neighbors, say it was made in August. W. F. Stout and Mrs. E. H. Stout not only say the visit was made in August, but that Mrs. Jarvis then said she had sold her Fink Creek land. That Mrs. Jarvis ever went to B. B. Stout's after her return from Randolph county is denied by her daughter, Mrs. Pickens, who says she never left her home but once after her return from Randolph county

and, on that occasion, visited her sister, Mrs. Bond, and her uncle, Henry Bassel. This is confirmed by Mrs. Bond, who says Mrs. Jarvis was never away from home afterward, and she fixes the time as the first or second week in September. Corroboration of the testimony of Mrs. Stout and her children is sought in the evidence of one George Murphy, who says Mrs. Jarvis owed him for work, and, after her return from Randolph county, went to B. B. Stout to obtain the money with which to pay him. He is flatly contradicted by Mrs. Pickens and Mrs. Currence, who say he never did any work for their mother and was never on her place. He does not fix the exact date of this alleged transaction, and it may have occurred, if at all, before Mrs. Jarvis obtained her divorce. Confirmation of the claim of purchase and corroboration of the witnesses who testified to these admissions is sought in the will of Mrs. Jarvis, made just a few days before her death. By this instrument, she gave her farm in Harrison county to her daughters, Celia and Louise. It was then subject to the lien for the money, charged upon it in the partition. The will contained this provision, respecting the farm and her interest in other lands: "I direct that any money that may be payable to me from the sale of land belonging to the estate of my father be applied in payment of the amount charged upon my land on Brushy Fork Creek whereon I now reside under the deed of partition between the heirs and my said father." No other reference to the Fink Creek land is found in the will. There is no direction to sell the same. It is said this provision in the will impliedly admits a previous sale of it. We think this clause is susceptible of a different interpretation. It may as well be assumed that the testatrix referred to the future or contemplated sale as a past sale. The expression is, to say the least, equivocal and lacks clearness and positiveness. It does not necessarily say the lands had been sold. It may well be assumed that if the sale had been made to B. B. Stout, the reference would not have been made to the land, but to money due her from Stout. There is no better foundation in the clause for the view that a sale had been made than for the opposite view that the land still belonged to her father's estate. We do not think this provision in the will is an admission of the sale of the land. If it be admitted that Mrs. Jarvis made demands upon

her brother for money before her death, there are circumstances in evidence, affording a basis for the view that he was indebted to her. Some years before her death, he had verbally purchased her Harrison county land, and, under that contract, had possession of it for more than a year. On account of the refusal of Mrs. Jarvis's husband to join in a deed conveying the land to him Stout abandoned the purchase and yielded possession of the land. About this time, he received some cattle from her.

Taken all together, we think this evidence of purchase is too uncertain and indefinite to sustain the claim. It is uncertain and contradictory as to time and is all together silent as to the price and terms. No doubt B. B. Stout expected to buy it and likely Mrs. Jarvis looked upon him as a prospective purchaser. There may have been some loose conversation on the subject, as there seems to have been between B. B. Stout and some of the other heirs, but the evidence falls short of the establishment of a contract of sale, fixing the price and terms and the execution of a written contract or memorandum, and there was no change of possession within the life time of Mrs. Jarvis, of which she had any notice, disclosed by the evidence. To sustain a bill for specific performance of an oral contract of purchase, the evidence must be clear, full and free from suspicion. *Harris* v. *Elliott,* 45 W. Va. 245; *Gillispie* v. *Jones,* 48 W. Va. 284; *Ensminger* v. *Peterson,* 53 W. Va. 324; *Westfall* v. *Cottrill,* 24 W. Va. 763; *Matthews* v. *Jarrett,* 20 W. Va. 415; *Blankenship* v. *Spencer,* 31 W. Va. 510. It must also disclose the price to be paid, this being an essential element of the contract.

The evidence of the purchase of the Bond interest consists, for the most part, of a memorandum, made on a note for $140.00, executed by Bond to Stout, which memorandum A. J. Sullivan says accords with an agreement made in his presence, and the testimony of James F. Stout to the effect that a deed had been sent to him for joint execution by himself and Bond, bearing the signature of Bond, which transaction he thinks occurred about 1882 or 1884. The memorandum on the note reads as follows: "It is agreed the above note shall be payment on the Lewis county land on Fink's Creek. September 1885." This is not signed by Bond, and the note, with the memorandum on it, remains in the hands of B. B. Stout. Some other witnesses

say Bond admitted to them his sale of the land to Stout. On the contrary, there is testimony to admissions on the part of B. B. Stout that he had not purchased of Bond, and James F. Stout is flatly contradicted in words and by evidence of inconsistent circumstances. That the note was never surrendered is another contradictory fact. Here again, there is no evidence, showing what price was to be paid. We do not think the evidence measures up to the requirement of the rule governing the proof of a parol contract for the sale of land.

A great deal of space in the briefs is devoted to discussion of the question whether the title bonds executed by B. B. Stout constitute color of title. On the one hand, they are regarded as having the same effect as deeds. On the other hand, they are denied such effect and the Krenns in possession under them are treated as tenants in common with the heirs of Mrs. Jarvis and the heirs of C. B. Bond. If they could be treated as deeds, void as to the interests of the Jarvis and Bond heirs and constituting only color of title as to these interests, the mere execution and delivery thereof would not constitute an ouster and put the statute of limitations into operation. The statute does not begin to run until after possession has been taken under such a deed. *Parker* v. *Grass,* 45 W. Va. 399; *McNeely* v. *Oil Co.,* 52 W. Va. 616, 636; *Hannon* v. *Hannah,* 9 Grat. 146; Freeman on Coten., section 226.

Another important principle, the application of which must be tested by the evidence in the case, is, that the statute of limitations did not run against the heirs of Mrs. Jarvis and C. B. Bond, unless there was an ouster before the respective deaths of these ancestors. In other words, if there was an ouster of C. B. Bond, in his life time, the statute began to run against him and continued to do so against the heirs after his death; and, if it was put into operation against Mrs. Jarvis, before she died, her death did not interrupt or stop it. On the contrary, if the act of ouster occurred after these parties died, the statute did not begin to run against such of their heirs as were infants, or, if it did, their right of action was not taken away or barred, until the lapse of five years after the attainment of their majorities. Their rights of action were saved by section 3 of chapter 104 of the Code. *Rowan* v. *Chenowith,* 49 W. Va. 287; *Mynes* v. *Mynes,* 47 W. Va. 681; *Jones* v.

*Lemon,* 26 W. Va. 629, 635; *Talbott* v. *Woodford,* 48 W. Va. 449.

B. B. Stout never actually resided on the Lewis county land. Before the death of James M. Stout, it was occupied by M. C. Gum, his tenant, but he had left it before said Stout died. Afterwards, about the year 1883, as nearly as he can recollect, he went back on the land at the instance of one Shackleford who claimed to act for B. B. Stout. Whether Shackleford had any authority or not is immaterial, since B. B. Stout afterward recognized Gum as his tenant, by accepting payment from him for the use of the land in labor, performed in cleaning up a portion of the land. Gum says: "I done the job of cleaning up for B. B. Stout as I told you a while ago. * * * I cleaned up for what I took off of it." In response to a question as to whether B. B. Stout exercised authority over him while on the premises, he said: "Well, he claimed that he had right to but didn't bother anything about it until the last spring I was there. That was when he sold to Joseph Krenn." Gum staid on the land until February, 1888, some months after the death of Mrs. Jarvis. He says Krenn gave him charge of it under him after he purchased it in April, 1886.. Neither Joseph Krenn nor John Krenn moved upon the land or put any other tenant upon it within the life time of Mrs. Jarvis, so far is the testimony shows. John Krenn says he put some cattle on the grass land and fixed up the fences within a few weeks after he bought, he thinks, but is unable to say just how long afterwards. He says Charles Shaner put part of the land in corn, as his tenant, the second summer after he bought it, and that said Shaner and his mother lived on the land for nearly two years. In response to a question as to whether he had had possession from the date of his purchase, he said: "This family that was living on it held possession for the summer of the part they had in wheat and then after that no one had possession except when I let them under lease for rent." There may be doubt as to what family he refers to, but there can be none about the fact that the visible possession was not changed at the date of the purchase. If he refers to Shaner as the party living on it at the time, he still lived on it the second summer after the purchase, according to his own testimony, and no visible change is mentioned as having occurred, until after the death of Mrs.

Jarvis.    Joseph Krenn admits that M. C. Gum was on the land at the time of his purchase, but says he entered into possession immediately after the date of the title bond.    In response to this question:  "State if you can the names of the tenants besides yourself who occupied this land at the time of your possession?" he said:  "M. C. Gum, John Leseburg, and I let one field to a man William Buckhannon and. another . field to Jacob Starcher."  He does not say in what year or years Leseburg, Buckhannon and Starcher were tenants, and Gum said Leseburg succeeded him.  This evidence fails to show that any new tenant was put on the land prior to the death of Mrs. Jarvis, and Krenn does not show that he himself resided upon it.  He testifies to no acts done upon the land by himself except fencing, clearing and putting in grass certain portions thereof and placing tenants on it.

Even if the title bonds could be regarded as color of title, the execution thereof would not, of itself, constitute an .ouster.  As we have shown, the ouster is not effected until possession is taken under the deed, and such possession must be open, notorious, hostile and exclusive.  It must have all the elements of adverse possession in any other case.  The mere execution of the deed is not notice of an adverse claim.  Something more must be done to apprise the co-tenant of intent to assert a hostile claim.  He might never know of the execution of the deed, since that could be done in secret, and recordation thereof would not be notice to him.  The recordation of a deed or other instrument is constructive notice only to such persons, and for such purposes as are specified in the statute, subsequent purchasers and creditors.    It was not the intent of the legislature, in ordaining it, to make it the duty of an owner of land to keep his eye upon the registry books to see whether some other person is selling his land.  In order to effect an ouster, actual, express notice of the hostile claim must be given to the co-tenant, or such acts must be done upon the land as he is bound to take notice of as being hostile.  Every owner is deemed to be cognizable of what is done upon his land and of who is in possession of it.  The law exacts this measure of diligence from him.  He must know whether strangers are entering upon it, and, knowing that, must inquire by what right they do so.  In every instance, such inquiry will presumptively lead to discovery

of the hostile claim. Hence, the owner is bound to know, and estopped from denying, all information to which such inquiry, prosecuted 'with reasonable diligence, would have led. By the great weight of authority, actual, open, notorious and exclusive possession under a deed from one co-tenant amounts to notice. The decisions and text writers may not all analyze the proposition and disclose all the reasons upon which it rests, but they do say the possession is referable to the title. This can mean nothing more than that the owner is under a duty to know who is in possession and then inquire by what right he claims to be entitled to it. Freeman on Cotenancy, at section 230, says: "The question manifestly is not to be determined solely by taking evidence to show that the cotenant against whom an adverse possession is claimed had actual notice thereof. As a property owner he ought to manifest some interest in, and regard for, his property. He cannot close his eyes and ears, nor by wilful inattention occupy an advantage over the defendant on his want of diligence. It is sufficient that the acts of adverse possession 'were such in their character and attendant circumstances that a man reasonably attentive to his own interest would have known that an adverse right was being asserted." Our decisions enunciate the same general doctrine. *Clark* v. *Beard,* 59 W. Va. 669; *Justice* v. *Lawson,* 46 W. Va. 163; *Cooey* v. *Porter,* 22 W. Va. 123; *Boggess* v. *Meredith,* 16 W. Va. 1. It is also stated and fortified by a great volume of authority in 2 Enc. L. & P. 493, and 1 A. & E. Enc. Law 806.

In order to work an ouster, the facts and circumstances must come up to these requirements. The possession must be unequivocal, else it is not sufficient to put the co-tenant upon inquiry. He must have notice in some form. If not actual notice, he must have the equivalent thereof. Newell on Eject. section 82. The doctrine of adverse possession is to be taken strictly in ordinary cases, and "The evidence to sustain an ouster by a cotenant must be still stronger, because of the peculiar relation of the parties." *Id.* section 79.

In view of the evidence, relating to possession at the date of the death of Mrs. Jarvis, it is obvious that there was no visible change in it, nothing 'which could have apprised her of any possession hostile to her. If Gum, the tenant, had the right to attorn to Krenn, his agreement to hold under him was

not an open notorious act, evidenced by appearances upon the ground, and she could not be deemed to have had any knowledge of it, in the absence of proof thereof, and there is none. This view of that matter makes it unnecessary to inquire whether Gum, with the consent of B. B. Stout, who was possibly the only landlord he knew, rightfully agreed to hold under the purchaser. The attornment of a tenant, without the consent of his landlord is void. Likely, Gum was as much the tenant of Mrs. Jarvis as of B. B. Stout, and his act was void as to her, but it is not necessary to decide this question.

We think it plain, therefore, that if the title bonds could be regarded as color of title under which an adverse possession could be held, as against a coparcener, there is no evidence of that open, notorious possession on the part of the vendee, necessary to the effectuation of an ouster and the starting of the statute of limitations in the life time of Mrs. Jarvis, and that her children, all of whom were then under age, were within the saving clause of said statute.

This does not dispose of the case, however. Some of her children had attained their majority more than five years before the institution of this suit, and it does not appear just when C. B. Bond died. It may be that the change of possession in 1888, when Gum left the land, purchased by one of the Krenns, and, the party occupying the other tract, at the time of the other Krenn purchase, left it, and these persons were succeeded by new tenants put on by the Krenns, their possession effected a change, sufficient to put the owners upon inquiry and this marked the point at which a right of action accrued, and started the statute of limitations against Bond, if he was then living, which seems probable, since his youngest child was only ten years old in 1903. This necessitates an inquiry as to the office and function of the title bond under the circumstances of the case and in view of the relation of the parties to one another and to the land.

Whether a title bond or other executory contract for the sale of land is color of title, as against a stranger, was discussed, but not decided, in *Lewis* v. *Yates,* 62 W. Va. 575. Decisions of other jurisdictions are sometimes invoked in favor of the view that such a writing constitutes color of title, but these should be cautiously received. In some states, the English

statute of uses, executing all forms of trust, prevails. After payment of purchase money, a court of equity looks upon the vendor as holding the land in trust for the vendee unconditionally. That is a sort of trust which said statute may execute, but which ours does not execute. We have held uniformly and without exception that, as between vendor and vendee, the possession of the latter is subservient, subordinate and not adverse to the former, until after a deed has been made. If the statute of uses executed such a trust in this state, these decisions would be erroneous and could not stand, for the legal title would pass by force of the statute on payment of the purchase money. The scope, operation and effect of our statute of uses have been defined in *Blake* v. *Oneal,* 63 W. Va. 483.

We do not think it necessary even here to hold that a title bond is color of title, and I am unable to conceive a case in which it would be necessary to do so. Color of title is always an element of defense and not a weapon of offense. With out possession or right of possession, no person can ever invoke it, for, of itself, it confers no title. A person in possession under a title bond, may, so far as I can see at present, always avail himself of the title of his vendor, or his grantor, immediate or remote, for whatever it is worth, be it good or bad. It is not necessary to say the Krenns by their acts alone, ousted the Jarvis heirs or Bond. Indeed, it cannot be said. B. B. Stout was the real actor. He executed title bonds and delivered them to the Krenns and the Krenns entered under them. If they had merely taken possession under the order and direction of B. B. Stout, without more, there would have been no ouster. Having taken possession, not in that manner, but under a paper in which B. B. Stout declared the title to be in himself alone, and claiming right of possession under that paper, they are in a different situation. They are claiming the benefit of an act done by B. B. Stout, the co-tenant himself. He asserted a claim of title in himself, which, if brought home to his co-tenant, was enough to effect an ouster. The entry of the Krenns was, therefore, mere execution of the adverse claim set up by B. B. Stout against his co-tenants. Hence, the Krenns may stand and, in reason, do stand, not upon their own act, but upon the act of B. B. Stout, who alone had power to effect an ouster. If there is any color of title in the case, it is that which B. B.

Stout holds, and which, together with his conduct in the asser-
tion of an adverse claim, affords protection to his vendees.

Apparently in anticipation of this view, counsel for the
appellees advert to the fact that James M. Stout seems not to
have had any deed for the land. The bill filed in the partition
suit, instituted in Harrison county, says he was the owner of
a tract of land, lying on Fink Creek, containing about 300
acres, which he purchased at a judicial sale, made under a·
decree of the circuit court of Lewis county, by a special com-
missioner, but for which no deed was executed though the sale
to him was confirmed. B. B. Stout says he has never been
able to find a deed for the land and sets that fact up as a
reason for his having suffered or procured a sale thereof for
non-payment of taxes. I do not think this constitutes any
ground for an exception to the rule I would apply. For the
purposes of this case, title in James M. Stout, at the time of
his death, is necessarily admitted by all parties, for all trace
their claims back to him. Whether he actually had a deed or
not, all admit that he had good title, for they claim under him,
and his title, whatever it was, constituted, in B. B. Stout, color
of title to the whole of the land as against all of his co-tenants,
on the assertion of his adverse claim. Let us suppose the
Krenns had not projected themselves into this controversy, and
it were one simply between B. B. Stout and his co-tenants, he
being in possession and claiming to have ousted them by actual
notice of an adverse claim and subsequent dominion over, and
exclusive control and enjoyment of, the property, for the statu-
tory period, after such notice. Is it possible that his defense
would fail because of his inability to produce a deed, as color
of title, all of them claiming title from a common source? It
seems to me that each and all of them would be estopped to
deny title in their ancestor. It is well settled in the law of
ejectment that parties claiming title from a common source,
need never go beyond that. Title in that common source is
conclusively presumed for the purposes of the case and the
same principle logically applies here.

In the cases of ouster between co-tenants, the making of a
deed or establishment of independent color of title is not neces-
sary, and, as a rule, does not exist. The color of title, if any,
in such a desseizor, is the deed or title under which both held

prior to the act of ouster. We discussed this principle in *Russell* v. *Tennant,* 63 W. Va. 623, 631, saying: "Up to the time of the ouster, the extent of his interest was not defined upon the ground. He was seized of an interest in every acre, foot, particle and molecule of land within the limits of the ancestral deed. His right was co-extensive with the boundaries thereof, but not exclusive. His possession, until that time, extended to the whole of the land, but, like his right, it was not exclusive. When he had effected the ouster, his possession was still co-extensive with the boundaries in the deed, but exclusive, and, after the expiration of twenty years following the ouster, his title became perfect, not only in respect to area, but also as to the *quantum* of interest. By the act of ouster and subsequent possession, he changed not the limits of the territory in dispute, but the character of his possession and title. The ancestral deed conferred upon each heir the right of possession of all the land. Possession is evidence of title. Possession under such a deed is obviously possession under color of title, although the occupant is not the sole owner and his possession is that of his co-tenants; and, if being in possession, he exclude his co-tenant and make his possession hostile to him, his possession thereafter would logically and necessarily be adverse under color, as well as claim, of title."

On the question of adverse possession, the remaining inquiries are whether the execution of the title bonds and possession, taken under them, constitute a sufficient assertion of a hostile claim against the co-tenants out of possession and notice thereof to effect an ouster. All the principles and reasons, advanced to sustain an ouster by possession under the deed by one co-tenant apply here with equal force. A co-tenant is not confined to any particular mode of ouster. Any acts on his part, evincing an intent to set up a hostile and exclusive claim, brought to the knowledge of the other party, is sufficient. The notice need not be in writing nor be in any sense formal. This is so well settled as to require no citation of authority. The execution of a title bond is an unequivocal assertion of title in the vendor. By that act the vendor impliedly says he owns the land and that is what he says in the same way by the execution of a deed. The paper itself is not of the dignity of a deed, but, as we have said, the form of the act done is im-

material. All that is required is a plain and unequivocal act of hostility and claim of exclusive ownership. If this be followed by exclusive possession and dominion, with knowledge, on the part of the tenant out of possession, of the hostile claim and possession under it, the ouster is effected. For an ouster effected by means of the execution of a title bond and possession under it, we have been unable to find a precedent, but the reasons upon which the like conclusion rests when a deed has been executed and possession taken under it are, so far as we can see, the same as those adopted here.

We are also of the opinion that after the tenants who were on the land, at the time of the execution of the title bond, were replaced by new ones, put on by the Krenns, the possession was adverse and the statute began to run, subject to the rights of infants, under the saving clause found in section 3 of chapter 104 of the Code. These new tenants undoubtedly held under the Krenns. With them, neither B. B. Stout nor any of the other heirs of James M. Stout had any relation whatever. They were not their tenants. Seeing them upon the land, or being under a duty to know they were there, it was their duty to inquire and the inquiry, had it been made, would have led to full information. Under the principles above stated, this conclusion is inevitable.

As the statute has been put into operation, it remains to say who are barred by it. In the case of John Krenn, purchaser of the 150 acre tract, the evidence seems to show that Shaner and his mother, tenants on it at the time he purchased it, left it within two years after the purchase. He says they were living on the place for nearly two years, but he does not know just how long, and then a few years afterwards a Mr. Starcher was put on it. Just when this occurred does not appear, but Krenn's evidence leaves no doubt that Shaner left in about two years, nor that after he left, some other person was in possession of it, for he says it has never been vacant. He pastured his cattle on it, and has cleared fifteen or eighteen acres. His own use of it in that way would suffice. In the case of Joseph Krenn, purchaser of the 245 acre tract, the tenant Gum left the place in February, 1888, and was soon succeeded by John Leseburg. More than ten years adverse possession has been shown

by each of them. This gives them title subject to the saving in favor of infants.

It was incumbent upon the heirs of C. B. Bond to bring themselves within this saving. A case of adverse possession having been shown, they could only avoid its effect by proving their disability. In this they have wholly failed. Nothing in the record discloses the date of the death of C. B. Bond, their ancestor. As we have said, the age of his youngest child indicates that he must have died long after 1888. This interest in the land is therefore completely barred. Mrs. Jarvis died before the possession became adverse, wherefore her children were within the saving clause. They were born, respectively, on the following dates: Mrs. Celia T. Pickens, Feb. 7, 1869; Mrs. Louise Jarvis Currence, Apr. 10, 1871; Meigs J. Jarvis, Sep. 5, 1874; Arnold B. Jarvis, Sep. 25, 1877; and Benjamin B. Jarvis, Feb. 17, 1883. The bill in this cause was filed at January Rules, 1901. The process issued Dec. 22, 1900, and was served Dec. 28th. Tested by the date of the service of process, with an allowance of five years after attainment of majorities, Mrs. Pickens is barred by more than five years; Mrs. Currence by more than three years; and Meigs J. Jarvis by more than three months. The other two Jarvis heirs are safely within the limit of time. This state of the case makes it necessary to say whether the disability of some of these heirs saves the title of those as to whom the disability has ceased.

Our statute amplifying and defining the remedy by ejectment, chapter 90 Code of 1906, provides in section 4 that no person shall bring such action unless he has, at the time of commencing it, a subsisting interest in the premises claimed, and a right to recover the same, or to recover the possession thereof, or some share, interest or portion thereof. Section 9 requires the plaintiff to state whether he claims in fee or for his life, or for the life of another, or for years, specifying such lives or the duration of such term; and when he claims an undivided share or interest, he shall state the same. Section 18 allows the plaintiff to recover any specific or any undivided part or share of the premises, though it be less than he claimed in his declaration. These statutory provisions enable any person to sue for and recover any portion or undivided share of any tract of land in which he has any interest. After the removal

of the disability of an infant by the attainment of his majority, there is no impediment to his suing and obtaining his share in a tract of land. His right of action is separate and not joint, or separate as well as joint. Therefore, no reason is perceived, nor any legal principle recalled, upon which it can be asserted that the disability of one or more tenants in common can constitute any excuse for the failure of others, not under any disability, to sue for their interests or shares. In *Redford* v. *Clark,* 100 Va. 115, it has been held that the statute of limitations is conclusive upon each tenant in common and joint tenant after the removal of his disability. To the same effect, see *Kane County* v. *Herrington,* 50 Ill. 232. In *Shannon* v. *Dunn,* 8 Blackf. (Ind.) 182, the court held as follows: "It is no answer to a plea of the statute of limitations to a writ of error, that, within five years next after one of the plaintiffs had arrived at full age, the writ was prosecuted." This means that both were barred by the removal of the disability of one. In *Marstellar* v. *McLean,* 7 Cranch (U. S.) 156, it was held necessary to show that all the plaintiffs were under disability to sue, in order to avoid the plea of the statute of limitations. This was an action of trespass for *mesne* profits after a recovery in ejectment by the plaintiffs. In *Wilkens* v. *Philips,* 3 Ohio Rep. 49, it was held that the disability of one of the plaintiffs saved the remedy for all. These decisions are diametrically opposite. In those cases, however, the demands were probably joint and not separable. Here, we have separable demands. Each plaintiff could sue for his own interest on the removal of the disability. We are of the opinion, therefore, that in cases of this class, each infant is barred by the lapse of the period allowed to him within which to sue after the removal of the disability.

It results from these findings and conclusions, that all of the plaintiffs, except Arnold B. Jarvis and Benjamin B. Jarvis, are precluded from right to share in the property by the statute of limitations. As these two are not barred, we must determine the shares to which they are entitled. Originally, there were seven shares. Elmer H. Stout, admitting advancements and refusing to bring them in, formally disclaimed in the Harrison county partition suit, and the other heirs assumed and paid the indebtedness against the estate, in consequence thereof. He

filed a formal disclaimer in this suit also, but subsequently exe-
cuted and delivered to B. B. Stout a deed for any interest he
may have in the land. The first of these papers was more than
a disclaimer. It was an admission in writing of the receipt by
E. H. Stout of his entire share in his father's estate by way of
advancements and a refusal to bring these advancements into
*hotchpot.* That not only bars him, as a disclaimer, entered of
record, would, but also passed his interest in the estate to his
co-heirs. Its effect was to leave the whole estate for division
among the other six heirs, not merely as the result of a dis-
claimer, but of his acknowledgment of the advancements to
him as and for his full share in the estate and his acceptance
of the same as such. *Squires* v. *Squires,* 65 W. Va. 611;
*Coffman* v. *Coffman,* 41 W. Va. 8; *Roberts* v. *Coleman,* 37
W. Va. 143.

Mrs. Jarvis was, therefore, entitled to one-sixth of the lands
in question, which descended to her five children, each of whom
inherited one-thirtieth of the tract hence, Arnold B. Jarvis and
Benjamin B. Jarvis are each entitled to an undivided
one-thirtieth of each of said two tracts of land, aggregating
one-fifteenth, and John Krenn to the remaining fourteen-
fifteenths of the 150 acre tract and Joseph Krenn to the remain-
ing fourteen-fifteenths of the 245.5 acre tract.

In so far as the decree denies relief to said Arnold B. Jarvis
and Benjamin B. Jarvis, adjudicates title against them and
dismisses the bill and amended bill as to them, and gives
costs to certain defendants, it will be wholly reversed, with
costs in this Court to Arnold B. and Benjamin B. Jarvis, but, in
all other respects the same will be affirmed, and a decree entered
here, adjudicating title as aforesaid and to the extent aforesaid
in said Arnold B. and Benjamin B. Jarvis, and the cause
remanded for further proceedings in conformity with the prin-
ciples and conclusions herein stated and the rules and prin-
ciples governing courts of equity, including the adjustment of
costs in the court below.

*Affirmed in part. Reversed in part. Remanded.*

BRANNON, JUDGE, *(concurring)*:

I concur in the decision. The great weight of authority is
that when a co-tenant makes a deed purporting to pass legal title

to a whole tract, and the grantee enters into actual possession, that *ipso facto* is an ouster or disseizin of the other tenants, and makes the grantee's possession adverse to other tenants and the statute runs in his favor. 2 Enc. L. & P. 493; 2 Enc. L. & P. 521. The weight of authority will sustain the text of that very late great work, saying, "These cases rest on the ground that the conveyance in fee and entry under it and possession are notorious and unequivocal acts of ownership of such a nature as to give notice to other co-tenants that the entry and possession are hostile and adverse to their title". Freeman, Cotenancy, section 224, so finds the rule on many cases. *Sudduth* v. *Sumeral,* 85 Amer. St. R. 883; *Buchanan* v. *King,* 22 Grat. 422. Our own cases so hold. *Talbott* v. *Woodford,* 48 W. Va. 449; *Bennett* v. *Pierce,* 50 *Id.* 406; *Pickens* v. *Fitzgraf,* 60 *Id.* p. 142. As long as a co-tenant continues in possession, giving no notice of adverse claim, his possession is for all; but where he conveys the whole to a stranger, this itself is a disloyal act, in itself repudiates his fellow's right; and added to this there is a stranger in physical possession, and the co-tenant must take notice that a stranger is in possession, and his co-tenant gone, and he has no right to presume that a stranger is holding in friendship to him. Possession is notice. The party must inquire as to his right. That surely is the law after deed. I go further and say that the same principle applies when one co-tenant assumes to sell the whole tract to a stranger by executory contract, and puts the stranger in possession. He has a writing passing right to the whole, just the same as a deed. What difference for this purpose? As Freeman says, "The entry of the grantee cannot be presumed to be that of a co-tenant nor in subordination to the rights of the co-tenancy. Acts of ownership by such a grantee must necessarily be adverse to any other part owner". If such is the presumption in case of a deed, why not in the case of an executory contract, as it purports to give right to the whole? But it is said that one holding under such agreement is not holding adversely to his vendor, and therefore not adversely to the co-tenant. But this vendee is a stranger. He is not bound to yield possession to his vendor, nor can the vendor force him out of possession, as he could have done before the statute, Code 1906, chapter 90, section 20. The claim that the deed or contract is not itself notice, but there must be

evidence of knowledge brought home to the ousted co-tenant, is not sound. The deed or contract, with possession, makes notice. I again assert that an executory contract is good color of title as I did in *Lewis* v. *Yates,* 62 W. Va. p. 597. I refer to my opinion there found, and will only add a few authorities. In *Defferback* v. *Hawke,* 115 U. S. 392, it is held that a writing "purporting to transfer title or to give the right of possession", is good color of title. Does not a contract of sale give right to possession to one in occupancy? Even the vendor cannot turn him out, as our statute forbids. Judge Dent so asserted in *Cecil* v. *Clark,* 44 W. Va. 698. In *Hale* v. *Marshall,* 14 Grat., on page 497, Judge Lee said: "And it never refuses to accept an equitable title as a sufficient basis for an adversary possession on which to make out a defense under the statute of limitations". *Mullins* v. *Carper,* 37 W. Va. 215. *Shanks* v. *Lancaster,* 5 Grat. 110 and *Koiner* v. *Rankin,* 11 *Id.* 425, say that an equitable title is good for color. We asserted in *Ketchum* v. *Spurlock,* 34 W. Va. 597, that an executory contract is color. In 88 Amer. St. R. 691 and 1 Cyc. 1098 it is shown that possession under contract when purchase money has been paid is color. How is payment material? As said in *McNeely* v. *Oil Co.,* 52 W. Va. at page 633, discussing this matter, payment is not necessary, citing a Texas case. This is so especially under Code 1906, chapter 90, section 20, dispensing with payment. See *Avent* v. *Arrington,* 105 N. C. 379, and Wood on Lim. 648, 649. In view of these many authorities, including our own, I cannot see why an executory contract is not color.

Miller Judge:

I concur with Judge Brannon in this note.

Williams, Judge, *(dissenting in part):*

I concur in the views of the majority of the Court in all the foregoing opinion except that portion of it which treats the possession of the Krenns, prior to the time they received their deed for the land, as adversary to the plaintiffs, and which applies the statute of limitations in bar of the rights of such of them to have partition of the land who had attained their

majority five years, or more, before the bringing of this suit. I do not think the Krenns' possession of the land was adverse until they received a deed of conveyance. They went into possession under a title bond, or contract of sale, under B. B. Stout. This title bond recognized title as still remaining in B. B. Stout, and provided for a future conveyance as well as future payments of the purchase money. Their deeds from B. B. Stout bear date May 3, 1894. Not until that time· did their possession take on the nature of an adversary possession. To constitute adversary possession it must not only be actual and visible, but it must be accompanied with either good title, or with color, or claim, of title. *Parkersburg Industrial Co.* v. *Schultz,* 43 W. Va. 470; *Creekmer* v. *Creekmer,* 75 Va. 430; *Atkinson* v. *Smith,* 2 Va. Dec. ·373 (24 S. E. 901). The writing under which the Krenns took possession does not purport to convey title; it provides for the making of a deed at a future time. Their possession, therefore, until deeds were made, was *under,* and not adverse to, their vendor. *Core* v. *Faupel,* 24 W. Va. 238; *Nowlan* v. *Reynolds,* 25 Grat. 137; *Clarke* v. *McClure,* 10 Grat. 305; *Alleghany County* v. *Parish,* 93 Va. 615; *Hudson* v. *Putney,* 14 W. Va. 561; *Parkersburg National Bank* v. *Neal,* 28 W. Va. 744. *Hudson* v. *Putney, supra,* holds that adversary possession depends upon the intention with which the possession was taken and held. In the present case the title bond expressly shows that the Krenns did not, and in fact could not, claim it as an evidence of title. It expressly recognizes the legal title as still outstanding.

I can not see how it could be considered even as *color* of title. "Color of title for purpose of adverse possession under the statute of limitations as to land is that which has the semblance or appearance of title, legal or equitable, but which is in fact no title." 1 Cyc. 1082. To the same effect are the following decisions: *Sharpe* v. *Shenandoah Furnace Co.,* 100 Va. 27; *Adams* v. *Alkire,* 20 W. Va. 480; *Oney* v. *Clendenin,* 28 W. Va. 34. "A void deed is good color of title." *Bennett* v. *Pierce,* 50 W. Va. 604; *Randolph* v. *Casey,* 43 W. Va. 289. "A deed or writing which purports to convey title is good as color of title." *Swann* v. *Thayer,* 36 W. Va. 46; *Mullins, Adm'r* v. *Carper,* 37 W. Va. 215. As long as the vendee is in possession of the land claiming under an executory contract of sale which

provides for a future conveyance there is a privity of relation between them, and the vendee can always rely on his vendor's title to protect his possession, and, on the other hand the vendor can always rely upon his vendee's possession in order to protect his title. I think it logically and necessarily follows, from the numerous authorities above quoted, that Krenns' possession was not an adversary possession until they got their deeds, and that so far as possession affects title, their possession, until that time, was the possession of B. B. Stout, and his possession was the possession of all the co-tenants. Consequently, the statute of limitations did not begin to run in the Krenns' favor until the 4th of May, 1894, which was less than ten years before the bringing of this suit. Even if a title bond could be regarded as constituting an equitable claim of title, it could not be so considered until all the purchase money had been paid, and the Krenns thus placed in a position to demand a conveyance of the legal title. By the terms of the title bond the last deferred payment was not due until the first of October, 1895. Consequently they did not have so much as an equitable title for as much as ten years prior to this suit.

Possession of the Krenns under the title bond, not being adverse to B. B. Stout, could not be adverse to his co-tenants, until they had knowledge of his intention to oust them from the land, and the statute of limitations would begin to run only from the time of such knowledge.

Possession can not be adversary as to one co-tenant without being adversary as to all. In the case of *McNeely* v. *Oil Co.,* 52 W. Va. 616, point 6 of the syllabus is, "Possession by a purchaser under an executory contract of sale made by the husband alone, of land owned in joint tenancy by husband and wife is not adverse to the wife." In that case the wife's interest in the land was her separate estate. I think that case should control the decision in this one, unless it is the purpose of the Court to overrule it, and the majority opinion does not expressly do so. The logic of Judge BRANNON's opinion in that case is so potent that I here quote the following extract from it, found on page 645, viz: "I have stated above that it is impossible to say that as the possession under the executory contract was not hostile to Nathan Higgins, it was nevertheless hostile to his wife,

and I say again that there could not be a possession adverse to half the tract, half the acre, half the pebble, half the molecule.

"But reflect further that nobody will say that as to Nathan Higgins the possession as to the whole tract was adverse. Everyone must admit that it was friendly. This being so, we then bring in the fact that between Higgins and his wife there was a relation of privity and unity, that of joint tenancy, and the same character the possession bore to Nathan Higgins it bore to his wife. The possession being by executory contract while the wife lived and not being adverse to him neither was it adverse to her. He was her tenant as well as his tenant. Dry law views them as such. A court of law views them as such, and adverse possession is governed by this view. Had Higgins made a deed, instead of a contract, the possession would have been adverse to him and being adverse to him so it would have been as to her."

I may add that the facts in that case are much stronger to affect the wife with constructive notice of the husband's intention to oust her, than they are in the present case to affect these plaintiffs, or their mother with knowledge of such intention on the part of B. B. Stout. But it was there held that the statute of limitations did not begin to run as to either co-tenant until deed was made.

I cannot see that the Krenns have established title by adversary possession. The case must then turn upon the question of whether or not there was an actual ouster of these plaintiffs by B. B. Stout, more than ten years before they sued. On account of the confidential relation and mutual rights of co-tenants, the law places the burden of proving an ouster upon the co-tenant asserting it, or upon his vendee who claims the benefit of it. *Parker* v. *Brast,* 45 W. Va. 399; *Justice* v. *Lawson,* 46 W. Va. 163.

The statute would not begin to run until plaintiffs, or their mother,.Mary M. Jarvis, had knowledge of the intention of B. B. Stout, to claim title adversary to them. *Parker* v. *Brast,* 45 W. Va. 399; *Justice* v. *Lawson,* 46 W. Va. 163; 23 Cyc. 492. There is no pretense that there was actual knowledge. I do not think the possession of the Krenns can properly be regarded as constructive notice to them. Their possession was the same as B. B. Stout's possession, while holding under the title bond.

B. B. Stout had a right to the possession, as did every other one of the co-tenants, and the possession of one co-tenant is the possession of all. The land lay remote from plaintiffs, and in a different county from that in which they lived. B. B. Stout was administrator on his father's estate, and, as the evidence tends to show, was taking care of this land. His co-tenants had a right to rely upon his performing this service faithfully, and no doubt they trusted him to do so. I admit that, if B. B. Stout had been receiving all the rents and profits from the land, and making use of the same to the exclusion of the others, and they had had knowledge of this, it would be sufficient to constitute an ouster, and would have set the statute of limitations in operation from the time of such knowledge. But there is no evidence that there was any rent received from the place by him. Witness M. C. Gum states that he ('witness) was living on the land at the time it was sold to the Krenns, that he went there as a tenant of James M. Stout, deceased, and that all the rent he paid was in the way of work done on the place, that there was very little of the land cleared at the time B. B. Stout sold to Krenns. Under all the facts and circumstances of this case, I do not think the possession of the Krenns could operate any more as constructive notice to the co-tenants, of B. B. Stout's intention to oust them, than if the possession had been held by B. B. Stout himself. It is against all authority to apply the same strict rule of law between co-tenants which applies between strangers, claiming the same land by adverse title. I do not think it is law to hold that each co-tenant is bound to take notice, at his right one claims title who happens to be in actual possession of the joint property, regardless of the question whether such person claims title under one of the other co-tenants or under a stranger. Yet this is the effect of the majority opinion. It would place the same obligation on a co-tenant to see that he is not ousted by his joint owner that the law places upon an individual owner of land to see that his land is not taken by the adverse possession of a stranger. It would change the rule of law which makes it the duty of the ousting co-tenant to prove an ouster. It would discharge the burden which the law places on him to prove it, by raising a presumption in his favor, of notice to his co-tenants, from facts of which they had no actual

knowledge. Notwithstanding one tenant in common may be in the exclusive possession of the land, claiming it as his own in severalty, it will not constitute an ouster of his co-tenants until knowledge of his adverse claim is brought home to them. *Boggess* v. *Meredith,* 16 W. Va. 1; *Cooey* v. *Porter,* 22 W. Va. 120; *Justice* v. *Lawson,* 46 W. Va. 163.

"Laches or acquiescence can not bar the right of entry of a co-tenant, until the actual disseizin has been effected by some notorious act of ouster *brought home to his knowledge.*" *Parker* v. *Brast,* 45 W. Va. 399.

I do not think the statute of limitations began to run in favor of B. B. Stout against plaintiffs at any time because they had no notice of his intention to claim adversely to them, and I do not think it began to run in favor of the Krenns until they got their deed, because prior to that time their possession was under and not adverse to, the common title of all the co-tenants. For these reasons I would reverse the decree of the circuit court as to all of the appellants, regardless of the question of infancy. I do not think any of them are barred.